## JOHN R. HASKINS v. F. A. ROYSTER.

Any third person, who without lawful justification, induces a party who, for a consideration, has contracted to render personal service to another, to quit such service and refuse to perform his part of the agreement, is liable to the party injured in damages.

That the consideration of a contract is too small, or its terms unreasonable, will not justify a Court, for the benefit of a third person not a party thereto, in setting such contract aside; nor is the fact that one of the contracting parties is appointed to decide as to the performance or non-performance of certain conditions, a sufficient cause for annulling and setting aside the same.

READE and SETTLE, JJ. dissenting.

CIVIL ACTION, to recover damages for enticing away laborers, heard before *Tourgee, J.,* at Spring Term, 1873, of PERSON Superior Court.

In his complaint, the plaintiff alleges that he had employed certain laborers, naming them, to work on his farm during the year 1871, under written contracts; and that while they were at work according to the terms of said contract, the defendant, in March of that year, unlawfully enticed and persuaded said laborers to leave his, the plaintiff's employment, and unlawfully harbored and detained them for the space of ten months. For this, plaintiff demands damages, &c.

The case states, that after hearing the evidence on both sides and before the case was left to the jury, his Honor decided that the plaintiff was not entitled to recover upon his complaint filed. To which ruling plaintiff excepted, submitted to a nonsuit, and appealed.

*W. A. Graham,* (with whom was *J. W. Graham* and *Mc-Corkle & Bailey,*) for appellant, filed the following brief:

The laborers mentioned in the statement of the case were the servants of the plaintiff, and enticing them away from his service or harboring and retaining them, with a knowledge of

their obligation to the plaintiff, was injury to him, to be redressed by an action.

1. This is so by the common law. The relation of master and servant has existed from the earliest stages of society. It is recognized both in the 4th and 10th commandments of the decalogue, and is said by Blackstone to be founded in convenience, whereby a person calls in the assistance of others when his skill and labor will not be sufficient to answer the cares incumbent on him. 1 Black. Com., 421. It is constituted by the contract of hiring. *Ibid,* 425. And as a general rule, every person of full age of 21 years, and not under any legal disability is capable of becoming a master or a servant. Smith on Master and Servant. Law Lib., 75, p. 1.

And beside the relations of the parties to each other, an action lies in favor of the master to recover damages against any person who shall hire or retain his servants, or seduce them away. 1 Black., 429, in text, and note in Sharswood's edition, 6 Mod. R. 182; 1 Parson's Cont., 532, and cases cited. Smith *supra.* 78, 79, and cases cited.

And although the defendant was ignorant of the first contract when he hired the servant, and no action may lie for enticing him away, yet if he *continued to employ or harbor him, after knowledge of the prior engagement an action lies. *Ibid* 79, 80. *Fawcett* v. *Beavers,* 2 Nev., 63; *Blake* v. *Lougee,* 6 T. R., 221. For instances of such actions in N. C., see *Harris* v. *Mabry,* 1 Ired., 240; *Mabson* v. *Seaboard Railroad Co.,* 4 Jones, 379; *Porter* v. *Seaboard Railroad Co.,* 6 Jones 245.

2. But such an action is given by a recent statute of this State, suggested no doubt by the present condition of labor, especially with reference to agriculture. A. A., 1865–'66, ch. 58, p 22, 23; A. A. 1866–'67, ch. 124, p. 197, the first giving an action and double damages, the second an indictment.

There have also been adjudications on what constitutes a "cropper," or servant, as contradistinguished from a tenant, who is a *quasi* proprietor. *State* v. *Burwell,* 63 N. C., 661; *Denton* v. *Strickland,* 3 Jones 61.

3. ·Compensation to the hired man by a *share of the crop*, does not render him any the less a servant, nor constitute him a tenant or partner. It is very different from a stipulation for a *share of the profits*.

In some cases the distinction may be difficult to draw. But in this case there is no difficulty. The direction and control of the whole operations of the year are vested in the plaintiff, with stringent securities, not only for obedience, but for correct and respectful behavior, towards him and his family, of all which he is made the judge.

Wherever in such a contract, the will of one party is to control, and the will of the other is subordinated, so that he is to conform his conduct to that control, the former is master and the latter a servant. No degradation is implied. The relation is the result of voluntary contract, and is adopted for the convenience and benefit of both parties.

*McCorkle & Bailey,* for appellant, filed the following additional brief:

Two views of the question involved are submitted:

First. Viewed under the doctrine of master and servant: There are a number of cases in which nice distinctions are taken between " tenants " and " croppers;" but without adverting to them, it is submitted that there is one unmistakable criterion deducible from all the cases, namely, has the party other than the land owner *an estate* in the premises? If not, he is a servant, not a tenant.

The contract under consideration gives full power to the land owner.

1. We submit that the contract specified in the complaint did not create the relation of landlord and tenant, but that Eastwood and the others became thereby mere croppers, and for this we cite *McNeely*, v. *Hart,* 10 Ired. 63; *Brazier* v. *Ansley,* 11 Ired. 12.

One who makes a crop for another, *vulgice,* a cropper, is a servant, a hired servant, and the circumstance that he is to re-

ceive payment in a portion of the crop, instead of money, is of no appreciable weight. If the land owner is to make division, then he pays, and the cropper does not, as in tenancies, pay the land owner as for rent. *Wiswall* v. *Brinson*, 10 Ired. 554.

2. Is there any policy of the law which forbids the creation of the relation of master and servant. In free England and the free Northern States, the relation has been recognized from the earliest times.

Society cannot long exist without grades, and the relation of master and servant springs from the earliest and always continuing needs of society, without reference to the character of government. All the elementary writers agree. See 1 Cooley Black. 429, note 15.

Independent of these considerations, the policy of our law has been recognized and declared by two acts of the Legislature, passed since the abolition of slavery. The act of 1865–'66, chap. 58, p. 122, gives an action for enticing or harboring any servant. The act of 1866–'67, chap. 124, p. 197, makes such an act indictable.

Second. But suppose Eastwood and others be treated on the broader ground, not of servants or employees, but of *contractors*, we submit even on this broad platform the plaintiff has stated a cause of action. *Ubi jus ibi remedium.* And this *jus* is not a mere right in conscience, but a legal as well as equitable ground of action, and extends to every legal demand or claim.

Whenever one has suffered damage by the wilful act or default of another, a *jus* accrues, subject on the modification that the injury is proximate. *Lumly* v. *Gye*, 2 Ell. Black. 216 ; *Barbee* v. *Armstead*, 10 Ired. 530.

RODMAN, J. We take it to be a settled principle of law, that if one contracts upon a consideration to render personal services for another, any third person who maliciously, that is, without a lawful justification, induces the party who contracted to render the service to refuse to do so, is liable to the injured

party in an action for damages. It need scarcely be said that there is nothing in this principle inconsistent with personal freedom, else we should not find it in the laws of the freest and most enlightened States in the world. It extends impartially to every grade of service, from the most brilliant and best paid to the most homely, and it shelters our nearest and tenderest domestic relations from the interference of malicious intermeddlers. It is not derived from any idea of property by the one party in the other, but is an inference from the obligation of a contract freely made by competent persons.

We are relieved from any labor in finding authorities for this principle, by a very recent decision of the Supreme Court of Massachusetts, in which a learned and able Judge delivers the opinion of the Court. *Walker* v. *Cronin*, 107 Mass. R., 555.

That case was this: The plaintiffs declared in substance that they were shoemakers, and employed a large number of persons as bottomers of boots and shoes, and defendant unlawfully and intending to injure the plaintiff in his business, persuaded and induced the persons so employed to abandon the employment of the plaintiff, whereby plaintiff was damaged, &c.

A second count says that plaintiff had employed certain persons named to make up stock into boots and shoes, and defendant well knowing, &c., induced said persons to refuse to make and finish such boots and shoes, &c.

The third count is not material to be noticed.

The defendant demurred. The Court held each of the counts good.

I shall make no apology for quoting copiously from this opinion, because the high respectability of the Court, and the learning and care with which the question is discussed, make the decision eminently an authority.

" This (the declaration) sets forth sufficiently (1) intentional and willful acts, (2) calculated to cause damage to the plaintiffs in their lawful business, (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause

on the part of the defendant, (which constitutes malice,) and (4,) actual damage and loss resulting."

" The general principle is announced in Com. Dig. *Action on the case A.*" In all cases where a man has a temporal loss or damage by the wrong of another, he may have an action upon the case to be repaired in damages." The intentional causing such loss to another, without justifiable cause, and with the malicious purpose to inflict it, is of itself a wrong." See *Carew* v. *Rutherford,* 106 Mass., 1, 10, 11.

" Thus every one has an equal right to employ workmen in his business or service ; and if by the exercise of this right in such manner as he may see fit, persons are induced to leave their employment elsewhere, no wrong is done to him whose employment they leave, unless a contract exists by which such other person has a legal right to the further continuance of their services. If such a contract exists, one who knowingly and intentionally procures it to be violated, may be held liable for the wrong, although he did it for the purpose of promoting his own business."

" Every one has a right to enjoy the fruits and advantages of his own enterprise, industry, skill, and credit. He has no right to be protected against competition ; but he has a right to be free from malicious and wanton interference, disturbance or annoyance. If disturbance or loss come as a result of competition, or the exercise of like rights by others, it is *damnum absque injuria,* unless some superior right by contract or otherwise is interfered with. But if it come from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, it then stands upon a different footing, and falls within the principle of the authorities first referred to."

" It is a familiar and well established doctrine of the law upon the relation of master and servant, that one who entices away a servant, or induces him to leave his master, may be held liable in damages therefor, provided there exists a valid contract for continued service known to the defendant. It has

sometimes been supposed that this doctrine sprang from the English statute of laborers, and was confined to menial service. But we are satisfied that it is founded upon the legal right derived from the contract, and not merely upon the relation of master and servant, and that it applies to all contracts of employment, if not to contracts of every description.

"In *Hart* v. *Aldridge*, Cowp. 54, it was applied to a case very much like the present."

"In *Gunter* v. *Astor*, 4 J. B. Moore, 12, it was applied to the enticing away of workmen not hired for a limited or constant period, but who worked by the piece for a piano manufacturer."

"In *Shepperd* v. *Wakeman*, Sid. 79, it was applied to the loss of a contract of marriage, by reason of a false and malicious letter claiming a previous engagement."

"In *Winsmore* v. *Greenbank*, Willes, 577, the defendant was held liable in damages for unlawfully and unjustly " procuring, enticing, and persuading " the plaintiff's wife to remain away from him, whereby he lost the comfort and society of his wife, and the profit and advantage of her fortune. *Barbee* v. *Armstead* 10, Ire., 530.

"In *Lumly* v. *Gye*, 2 El. & Bl., 216 (20 Eng. L. & E. R., 168,) the plaintiff had engaged Miss Wagner to sing in his opera, and the defendant knowingly induced her to break her contract and refuse to sing. It was objected that the action would not lie, because her contract was merely executory, and she had never actually entered into the service of the plaintiff; and COLERIDGE, J., dissented, insisting that the only foundation for such an action was the statute of laborers, which did not apply to a service of that character; but after full discussion and deliberation, it was held that the action would lie for the damage thus caused by the defendant."

To the same effect are *Jones* v. *Jeter*, 43 Gaþ. 331, and *Salter* v. *Howard*, *Ib.* 601, in both which cases the servants enticed were employees in husbandry. The only case to the contrary that we are aware of, is *Burgess* v. *Carpenter*, 2 Rich. S. C. 7; but the authorities relied on in that case seem to

us not in point.  And although this action is not brought under our act of 1866, (Bat. Rev., ch. 70,) yet that act is evidence of the common law.

It is suggested, (for we did not have the benefit of an argument for the defendant,) that in the present case the contract between the plaintiff and Eastwood and Wilkerson is unreasonable and therefore void.  We cannot suppose it to be contended that this Court, or any Court, when there is no suggestion of fraud, can inquire whether the reward agreed to be paid to a workman is the highest that he might have got in the market, and to declare the contract void, or to make a new one if it thought not to be the highest.  No Court can make itself the guardian of persons *sui juris*.  That would be an assumption inconsistent with their freedom.  We suppose the objection to point to that part of the contract which is, in substance, that if either party of the second part, or any person for whom they contract, shall misbehave *in the opinion of the party of the first part*, such misbehaving party shall quit the premises *and forfeit to the party of the first part* all his interest in the common crop.

It is said that these provisions make the plaintiff a judge in his own cause, which the law will not allow, and that they are manifestly so oppressive and fraudulent as to avoid the whole contract.  This proposition will be found on examination to go much too far even as between the parties to the contract, and to have no application as between one of the parties and a malicious intermeddler, as the defendant must, in this stage of the case, be considered.

It is not necessary to decide what would be the effect of such a stipulation in an action on the contract between the parties to it.  But as there seems to be some misconception of the law of such a case, and as although there are numerous authorities on the question, it is not yet of "familiar learning." in our Courts, a few observations will more conveniently lead us to the question actually presented.

The authorities are conclusive that the parties to a contract,

if there be no fraud or concealment of the interest, may agree to make a person interested, or even one of the parties an arbitrator to decide all controversies which may arise under the contract, and such agreement will be valid and effectual.

In Watson on Arbitration, (85) it is said: "It seems that it is no objection to an award, that the arbitrator was a party, or interested in the matter submitted, provided that the party objecting, at the time of the submission knew that the arbitrator was so interested; as in the case when Sergeant Hards took a horse from my lord of Canterbury's bailiff for a deodand, and thereupon the Archbishop brought his action, and by a rule of Court it was referred to the Archbishop to set the price upon the horse; the sergeant afterwards sought to set aside the award, on the ground of the interest of the Archbishop; but it was denied by Lord HALE, and *per totam curiam.* Comb. 218; S. C., 4; Mod., 226; Hard, 43; 1 Inc.& W., 511. See also Russell on Arbitration, 108. In Morse on Arbitration, it is said that a person interested or partial, is incompetent to act as an arbitrator, (p. 100.) But the parties may, if they choose, waive the objection. "They are at liberty to select a person interested or a person prejudiced, a relation, or an enemy of either of them. *Strong* v. *Strong,* 9 Cush. 560 ; *Fox* v. *Hamilton,* 10 Pick, 275. See also Morse 108. The most important case on this question, however, is *Ranger* v. *Great Western R. W. Co.,* 5 H. L. 72. There it was agreed between the plaintiff, who contracted to build the road, and the Company, that Brunel, who was the engineer of the Company, and a large shareholder in it, should be the judge of the amount and value of the work done. The Lord Chancellor, after saying that Brunel was the mere agent of the Company, and in effect the Company itself, continues : "It does not appear to me to be necessary to institute any minute inquiry as to how far the calculations of Mr. Brunel were accurate. *I think it quite enough if they were bona fide,* and with the intention of acting according to the exigency of the terms of the contract. The Company expressly stipulated that during the progress of the

39

work, the decision of the engineer, as to the value of the work, should be final. If the appellant thought this a harsh or oppressive clause, he ought not to have agreed to it. It does not, however, seem to have been unreasonable." To the same effect, are *Elliott* v. *Southdown R. W. Co.*, 2 De Gex & Sm. 17; *Hawley* v. *N. S. R.*, W C. Id. 33; *Kimberly* v. *Dick*, 13 Eq. Cases, 1.

The case of *Ranger* v. *Great Western Railway Company*, also holds that penalties and forfeitures upon a contractor, provided for in case the work be not properly done, or done in due time, are reasonable, and will be enforced, even to the great loss of the careless or dilatory contractor.

These authorities unquestionably establish that such stipulations are not void or voidable, even as between the parties, and it has never been supposed or contended that they made the whole contract void; as even if void themselves, they are clearly separable from the other parts. Either party, therefore, could maintain an action on this contract.

It is important however to notice, that none of these authorities goes to the length of holding, that if after the contractors had duly performed all or a part of the work, the plaintiff had *mala fide*, or without lawful cause, discharged them, they could not recover upon the contract. The contrary is implied in the language of the Lord Chancellor in *Ranger* v. *Great Western Railway Co.*, and is evidently most consistent with reason and justice. The power attempted to be reserved cannot have any greater effect than to make the discharge *prima facie* lawful, if so much as that.

Contracts with such stipulations as we find in the present, are not to be commended as precedents. Such stipulations are unusual; they answer no useful purpose, and suggest an intent (perhaps in this case untruly) to take some improper advantage, and to exact from the employees a degree of personal deference and respect, beyond that civil and courteous deportment which every man owes to his fellow in every relation in life. To this extent, a mutual duty is implied

in every contract which creates the relation of master and servant. If the servant fails in due respect, the master may discharge him, and so, if the master fails, the servant will be justified in quitting the employment.

Again it is suggested, that the contractors of the second part in this contract are *croppers*, and not servants. By cropper, I understand a laborer who is to be paid for his labor by being given a proportion of the crop. But such a person is not a tenant, for he has no estate in the land, nor in the crop until the landlord assigns him his share. He is as much a servant as if his wages were fixed and payable in money.

It is unnecessary to discuss the question whether one who maliciously persuaded a *tenant* to abandon his holding, would not be liable in damages for such officious intermeddling.

But whatever may be the effect of the provisions commented on, as between the parties to the contract, the authorities are clear and decisive that a person in the situation of the defendant, can take no advantage from them. As the case now stands, he cannot pretend to play the part of a chivalrous protector of defrauded ignorance. For the present at least, he must be regarded as a malicious intermeddler, using the word malicious in its legal sense.

There is a certain analogy among all the domestic relations, and it would be dangerous to the repose and happiness of families if the law permitted any man, under whatever professions of philanthropy or charity, to sow discontent between the head of a family and its various members, wife, children and servants. Interference with such relations can only be justified under the most special circumstances, and where there cannot be the slightest suspicion of a spirit of mischief-making, or self interest.

To enable a plaintiff to recover from one who entices his servant, it is sufficient to show *a subsisting relation of service*, even if it be determinable at will. In *Keane* v. *Boycott*, 2 H. Bl., 511, the plaintiff sued a recruiting officer for enticing his servant. The servant was an infant and had been a slave in St. Vincents where he indentured himself to serve the plain-

tiff for five years. The indenture of course was void upon a double ground, but the Court held the plaintiff entitled to recover. EYRE, C. J., says, " The defendant in this case *had no concern in the relation between the plaintiff and his servant ; he dissolved it officiously,* and to speak of his conduct in the mildest terms, he carried too far his zeal for the recruiting service." In *Sykes* v. *Dixon,* 9 Ad. & El., 693, that case is distinguished from *Keane* v. *Boycott,* upon the ground that the servant had quitted his master before the defendant employed him, and there was then no subsisting relation of service. In *Evans* v. *Walton,* 2 C. P., 615, (E. L. R.) it was held not necessary to show a valid and binding contract for service, but only the existence of the relation. If the servant was one at will, the action could be sustained. *Salter* v. *Howard,* 58 Ga., is to the same effect.

We are of opinion that the complaint sets forth a sufficient cause of action.

The judgment is reversed and the case remanded to be proceeded in, &c. Let this opinion be certified.

PER CURIAM.                              Judgment reversed.

READE, J., (*dissenting.*) I cannot agree with the majority of the Court, and the subject is of such general concern and of so much importance, that I must depart from our usage to allow the opinion of the majority to pass as the opinion of all in matters of minor importance.

I do not deny that, in some sense, every one who renders service for another is that other's servant ; but I do deny that in every such case the *relation of master and servant* is established. The child is servant of the parent, the wife of the husband, (and why not the husband of the wife ?) the lawyer of his client, the physician of his patient, the pastor of his church, &c. And so the mechanic who contracts to build my house, and the teacher who contracts to teach my children, and every one who contracts to do anything for me, is, in some

sense, my servant; and my correspondent is my " most humble servant." But none of these fall under the well defined and well known title of master and servant. Every layman understands that there is such a relation, just as there is the relation of husband and wife. And every lawyer when he desires to know what constitutes that relation and what are its incidents, looks under that head, and if he looks under any other head, it is only for analogies. Blackstone says, " The three great relations in private life, are, 1st. That of *master and servant;* 2d. That of *husband and wife;* 3d. That of *parent and child.* And the law makes a 4th. That of *guardian and ward.*" In discussing these relations, he says, " I shall first consider the several sorts of servants, and how this relation is created and destroyed. The first sort of servants therefore acknowled by the laws of England, are *menial servants,* so called from being *intra menia* or domestics. The contract between them and their masters arises upon the hiring."

This is an ancient servitude, embracing duty, subjection and allegiance on the part of the servant, and superiority and power on the part of the master. Bac. Ab. Master and Servant. And these characteristics, modified by times and circumstances, always distinguish the relation of master and servant; and Mr. Graham's brief refers us to the decalogue, fourth and tenth commandments, as showing that such were the characteristics of servitude in those days.

Quoting again from Blackstone : " Another species of servants are called apprentices, (from *apprendre,* to learn,) and are usually bound for a term of years by deed indented, or indentures, to serve their masters, and be maintained and instructed by them."

Servitudes of this kind were at first formed by the parties themselves, or by their parents or friends acting for them. But subsequently, the overseers of the poor, or other proper authorities bound out poor children as apprentices. The incidents to the relation of master and apprentice were, on the part of the apprentice, service and subjection; and on the part

of the master, power, instruction, protection and maintenance. The mode of apprenticing by indentures of the parties, was at common law, and the binding by the overseers of the poor, was by statute ; and *we* have had similar statutes.

It is not pretended that any such relation as I have de_ scribed exists in the case before us. There is no other relation of master and servant known to the common law. How then an the relation in this case be that of master and servant ? Take it that there is a contract of service—hard enough in its terms—yet there is wanting the element of protection and maintenance on the part of the plaintiff, which is indispensable to create the relation of master and apprentice. If therefore, any of the many authorities cited in the learned opinion of the majority in this case are founded on the relation of master and servant which I have been considering, they are inapplicable. There are, however, relations of master and servant in England other than those which I have been considering.

Quoting again from Blackstone : " A third species of servants are *laborers*, who are only hired by the day or the week, and do not live *intra menia* as part of the family ; concerning whom the statutes before cited have made many very good regulations : 1. Directing that all persons who have no visible effects may be compelled to work. 2. Defining how long they must continue at work in summer and in winter. 3. Punishing such as desert their work. 4. Empowering the justices at sessions, or the sheriff of the county to settle their wages; and 5. Inflicting penalties on such as either give or exact more wages than are so settled.

There are many of these statutes in England, regulating almost every species of trade and labor, with very stringent terms against the laborers and servants, as well as against the masters, and innumerable decisions have been made under these statutes, and neither text writers nor judges have always been careful to distinguish between cases under the statutes, and not under the statutes. Such cases are not authority here, because we have no such statutes. And yet it is very evident

that the complaint is based upon the learning and cases under those statutes. It begins by setting out that the alleged servants "bound themselves as laborers." And charges that the defendant did "*harbor and detain them.*" Evidently going upon the idea that the relation of master and servant existed.

Having divested the case of the supposed character of master and servant, I propose now to consider it as it is, a contract between the parties.

I do not deny what is said in the learned opinion of the majority that if there is a contract between A & B for any purpose, and C induces B to violate the contract to the injury of A, A has his action against C for damages. Not upon any idea of master and servant, however. In the leading case from Massachusetts, put by my learned brother, where the shoemaker was induced to break his contract, the learned Judge puts it upon the ground of breach of contract. And so it was where the actress was induced to refuse to fulfill her engagement. There was no relation of master and servant. And the reference to it is only for the analogy.

The relation of master and servant was never supposed to exist between Barnum and Jennie Lind, nor between Strakosch and Neillson. But still I admit that if a third person had induced these *queens*, not *servants* of song, to violate their contracts, such third person would have been liable in damages.

But I do not admit that to induce one to violate a contract is *per se* actionable, as it is the relation of master and servant or master and apprentice. In order to make it so there must be *damage.* And the damage must be specifically charged and proved. There is no charge of damage. Damages are "*demanded*" but none are *charged* to have been sustained. There must be a *per quod* in all such cases. Here there is none. In the Massachusetts case, which leads and is made the basis of the opinion of the majority, the learned Judge enumerates four requisites to sustain the action, which the declaration must contain, and which the declaration in that case did contain:

"1. Intentional and wilful acts.

2. Calculated to cause damage to the plaintiffs in their lawful business.

3. Done with the unlawful purpose to cause such damage."

Now grant, for the sake of the argument, that the complaint in this case contains the three first requisites, although I do not think it does, yet the fourth requisite is wholly wanting.

"4. Actual damage and loss resulting."

In regard to this last requisite, which is the gist of the whole matter, and without which there can be no recovery in any such case, there is no allegation whatever. In the Massachusetts case, each count in the declaration contained the *per quod;* " Whereby the plaintiff lost the services, &c., and all the advantages and profits, &c., and incurred large expense to procure other suitable workmen, &c., and were compelled to pay much larger prices, &c., and have been hindered in their business to a large extent, &c., from which they would otherwise have realized large profits, &c." And the second count: " Whereby their stock of leather was greatly damaged, and they were compelled to pay much higher prices, &c." And so in the other count. If all this was necessary in that case, which is the basis of this, why is it not necessary in this? It is necessary in every case, and no case can be found in England or America, where it has been held otherwise. It is common learning. And doubtless was overlooked in the learned opinion of the majority, because we had no argument on the part of the defendant, and other points were made prominent as the *only* points by the learned counsel for the plaintiff.

2. The contract is not binding upon the laborers because of fraud and imposition apparent on its face.

That Eastwood and Wilkerson are ignorant, is apparent from the fact, that they make their mark to the agreement. That they are poor, is apparent from the fact that they have no homes, but have to live on the lands of the plaintiff; and they have neither teams nor tools with which to make a crop, and that they are dependent, is apparent from the fact that they stipulate against their " insolence," and that of all their family,

towards the plaintiff and all his family, without requiring like stipulations from the plaintiff; and from the fact that they put it in the power of the plaintiff, at any time during the year, to turn them out of their houses, and take to himself the whole of their labor and crop; and that, not alone for unfaithfulness in their business, but for what he or any of his family may be pleased to consider disrespectful behavior to him, or to any of his family, in no way connected with their business—the mere flout of a child, it may be. And that the plaintiff used his power over them fraudulently, to circumvent them, is apparent from the fact that he took from them such an unconscionable agreement.

The plaintiff's counsel informed us that his researches had found but one case where a contract had been resisted at law as unconscionable; where a grain of rye had been promised for the first day, increasing every day in geometrical progression for a considerable time, when it was found that there was not as much rye in all the world. There is another kindred case, where a horse was shod for a penny for the first nail, and increasing for every other nail, in geometrical progression. These cases are too remote and comical to be of any practical use, but the books are full of cases where Courts of equity, as we are now, have relieved against contracts founded in fraud and circumvention, and where equity refuses to enforce contracts which have the element of hardship or unfair advantage. In order to meet this view of the case, the opinion of the majority estimates that although the contract stipulates that Haskins has everything in his own hands, and he is to do whatever "suits" him, yet if he were to discharge the laborers without good cause, they might have their action against him. But then the opinion fritters the right away to nothing, because it goes on to argue and cite authorities to show that a man may be judge or arbitrator in his own cause; and besides, what poor remedy is a law suit for these laborers who have neither time nor money to spare. The only security against such contracts is for the Courts utterly to ignore them. And yet,

instead of ignoring this contract, the most important principles are subjugated to sustain it. It is made the case of master and servant without the element of maintenance on the part of the master; and in order to sustain the stipulation for the arbitrary will of the plaintiff to govern all, the wholesome rule, that no one shall be judge in his own cause, is subordinated.

· 3. But the gravest objection to the contract is, that is against public policy.

If Eastwood and Wilkerson had contracted in so many words to be the *slaves* of the plaintiff, it would be conceded to be against public policy, and void. But here is a condition worse than slavery. If slaves, he would have been entitled to their services and could have enforced their good behavior and punished their insolence, but he would have been obliged to feed and clothe them and provide them shelter. But here he stipulates for their services and for their good behavior, and that they shall feed and clothe themselves and leave their homes at his bidding, leaving to him the results of their labor. And then, if any third person shall entice them away from such a contract and furnish them employment by which they can live, he claims to recover of such person damages. It is plain to see that if such contracts were allowed, society would soon be disorganized with the worst results, both to employers and laborers. There is no greater danger in any community than a dependent class upon whom is the hand of oppression bearing hard, and who have no where to look for relief. Consider who these parties are, and their condition. The plaintiff is a land owner. He agrees with two laborers, one white and the other colored, to furnish them land, teams, &c., and they are to cultivate the land and the crop is to be divided between them. Such relations have always existed in the State. They have never been called master and servant, but landlord and tenant, lessor and lessee, cropper or partners, according to the contract. There has never been anything degrading in any of these relations; public policy requires that there should not be. The State has no greater interest, than that all her citizens,

laborers and employers alike, should have the spirit, behavior and independence of manhood. Now turn to this contract. "The said Eastwood and Wilkerson agree to work faithfully all the year, and cause their hands to do the same; they are to work wholly by the orders and directions of said Haskins at all times, and should any of the above mentioned hands fail to work to *suit* the said Haskins, he has the privilege to discharge them at any time he may think proper." This would seem to be strong enough to secure to Haskins all that he ought to have expected, the right to discharge them at any time if they failed to work to *suit him*. But the contract goes on, "The hand or hands discharged losing all their labor and time done by them on the farm of said Haskins, and leave the plantation immediately, the said Haskins drawing their proportionate part of all the crops." Surely that was enough, but it proceeds, "Should any of the said hands be, in the judgment of said Haskins, insolent to said Haskins, or disrespectful to him, or any of his family, the said Haskins has the privilege of discharging said hands at any time, the said hand discharged losing all the labor rendered by him." No one can read the contract without being satisfied that the best interest of society forbid that it should be enforced or in any way countenanced in the Courts. It bears upon its face the evidence that the plaintiff intended to get the labor of these men and discharge them and keep their earnings. And then what could they do? Men with families, the year gone, and all their earnings gone. The alternative is the poor house or crime and the jail.

What would be the condition of society if every contract was of this character? And if one may be, all may be. On the first of November the plaintiff might drive off the laborers and their families, and keep all their earnings; and then for the winter, they would be without shelter, food or raiment; they would be paupers, and every community must support its paupers. And every government must provide for its paupers, and to prevent pauperism, every prudent government regulates the relations of masters and servants, and masters

and apprentices. And, as labor is always more or less dependant in most countries thickly populated, they have statutes regulating labor. In England they have "laborers' statutes" regulating almost every species of labor, with a view to the protection of both employer and laborer. And I think no case can be found in England or America where such a contract as this is authorized by statute, or supported by the Courts. Indeed, I do not know that it can be fairly inferred from the opinion of the majority in this case, that this contract would be supported, if the controversy were between the plaintiff and the laborers. I think it would not.

4. This brings me to the only other point. It is said that even if the contract is such as the laborers may violate with impunity, yet the defendant is a malicious intermeddler, and does not stand upon the same footing with the laborers. I admit that it is of much importance to the best interests of society that valid contracts of every kind, and especially those between employers and laborers, should be observed in good faith; and that officious intermeddlers should find no favor. But it is a rule of common sense, that what one may lawfully do, another may advise him to do. Yet I admit that there is respectable authority for saying, that where there is a voidable contract which one of the parties may violate with impunity, if a third person induces him to violate it, he may be liable. The instance put is, where an infant is a party to a contract which is voidable by him, and a third person induces him to violate it, he is liable. And why should he not be? for the contract may be for the advantage of the infant; and both the infant and the public interested in its observance. But Mr. Smith, in his work, entitled master and servant, p. 7, says: "But it has been held that a contract by an infant binding himself to serve during a certain time for wages, but enabling the master to stop the work whenever he chose, and retain the wages during the stoppage, is wholly void as not being beneficial to the infant." For which he cites *Reg.* v. *Lord*, 12 Q.

B. 757. Observe the difference between void and voidable contracts.

Under the new *regime*, much of the labor of the country is performed under contract. This is the first case which has been before us in which the incidents' of the relation of employer and laborer have been under discussion, and will probably be looked to as a precedent. I think it of great importance that employers should make only just and reasonable contracts; that laborers should be faithful on their part; and that third persons should not intermeddle. If either of these classes violate their plain duties, they will find no favor. What I say for myself, I think I may say for this Court, and for all Courts Only to prevent a contrary influence is the aim of much that I have said.