## SCHONWALD *et al.* v. RAGAINS.

No. 1505.  Opinion Filed March 12, 1912.

(122 Pac. 203.)

1.  **TORTS—Interference with Contract Rights.** Legitimate competition, by fair means, is always lawful, and no cause of action accrues to one who is unable to compete with his stronger competitor, notwithstanding his business be injured by the competitive strife. But unfair competition is, and always has. been, frowned upon by the law, and the trend of the decisions sustains the proposition that it is a violation of a legal right to interfere with contractual relations recognized by law, if there be no sufficient justification for the interference.

2.  **SAME.** It is impossible to formulate any general rule or definition whereby one may determine with accuracy what is fair competition, and what is not. Each case must depend, for its correct solution, upon its own peculiar facts and circumstances.

3.  **SAME—Malicious Interference with Contract.** It is an actionable tort for one to maliciously interfere with a contract between two parties, and induce one of them to break that contract, to the injury of the other.

4.  **SAME—Unlawful Interference with Contract.** It is not unlawful for one, by fair means and lawful argument or persuasion, to in-

terfere with the contractual relations of another, and without doubt one person has the legal right to persuade another to leave his employer's service, or to quit trading with another, provided always such persuasion and argument is fair, and not unlawful, and is made with the honest intent and purpose of fairly bettering one's own business, trade, or employment, and not for the primary object of wrongfully destroying honest competition, or wrongfully injuring one's competitor.

5.   SAME—"Malice."   "Malice," in the sense used herein, means a wrongful act done intentionally, without just cause or excuse.

(Syllabus by Robertson, C.)

*Error from District Court, Kay County;*
*W. M. Bowles, Judge.*

Action by James G. Ragains against Dave Schonwald and others.   Judgment for plaintiff, and defendants bring error.   Affirmed.

In the winter of 1904-05, Ragains, the plaintiff below, took from the Chikaska river and stored in the city of Blackwell a large quantity of merchantable ice, with intent to sell the same at retail to the merchants and other customers in said city.   In pursuance of such intent, he solicited and procured contracts with a large number of such consumers, and made all necessary arrangements for the complete establishment of a retail ice business in said city, and, in fact, began to distribute ice among his customers.   Schonwald, one of the defendants below, who was also the general manager and agent of the Blackwell Ice Company, the other defendant, according to the averments of the petition, with a malicious, wrongful, and unlawful intention of injuring plaintiff in and about his said business, and of wholly destroying his said business and depriving said plaintiff of his customers for the sale of his ice, and for the purpose of procuring the purchasers of plaintiff's ice, with whom plaintiff had contracts, to disregard their said contracts and to refuse to accept plaintiff's ice thereunder, did, during the months of February, March, April, and May, 1905, acting jointly and in conjunction, one with the other, and with various other ice companies (naming them), represent to the persons with whom plaintiff had contracts for the sale of ice and with the customers

of his retail ice business that plaintiff was not a·member of the combination or association of ice dealers, and could not, therefore, purchase from the manufacturers 'of ice in that and the adjacent territory any amount with which to supply his customers, and that if they, the said customers and consumers, and the persons with whom plaintiff had contracts, purchased ice from plaintiff, that they, the said defendants, and each of them, and all other persons engaged in the sale of ice in the city of Blackwell, would refuse to sell or deliver ice to any such person so purchasing from plaintiff, and further represented to plaintiff's customers and the persons with whom he had contracts for the sale of ice that plaintiff would be unable to purchase ice from any manufacturer on account of combinations and understandings had with such manufacturers by defendants, and that at such time as his customers had exhausted the supply of natural ice stored by plaintiff such customers and persons with whom plaintiff had contracts would be unable to procure or purchase from defendants or any other person any ice for their use, and that, in furtherance of the design on the part of the defendants in carrying out the threats and representations so made, the said defendants, and each of them, did refuse to sell to persons who bought ice from plaintiff, and said defendants and each of them did refuse to sell ice to any person with whom plaintiff had contracts for the sale of ice, unless, and until, said persons and said customers had agreed and promised to disregard their contract of purchase which they had made with the plaintiff, and would further agree not to accept any further delivery of ice from said plaintiff; that said false and malicious representations, threats, and intimidating statements, as above related, so made by Schonwald and the Blackwell Ice Company, by and through its officers, agents, and employees, did intimidate, coerce, and influence the persons with whom plaintiff had contracts for the sale of ice, and the customers of plaintiff's retail ice business in the city of Blackwell, to break the said contracts had with plaintiff, and did cause all of them to refuse to purchase or accept the delivery of ice from plaintiff, and that thereby said de-

fendants by their said wrongful, illegal, and malicious representations, intimidating statements, and conduct, did wholly and completely ruin and destroy plaintiff's retail ice business in the city of Blackwell; and that said defendants did wrongfully, unlawfully, and maliciously, and with a malicious intent to destroy plaintiff's business and to injure him, influence all persons manufacturing ice for sale to the inhabitants of the city of Blackwell and vicinity to refuse to sell or deliver any ice to plaintiff for sale to the residents of said city, all to his great damage, etc.

The court in its instructions to the jury held that there was not sufficient evidence to support the allegations of conspiracy by defendants and other ice companies, and therefore withdrew that issue from their consideration, and no finding was made by the jury upon that question, and the same will therefore receive no further consideration.

The answers of defendants were in effect general denials. Trial was had to a jury, and a general verdict was returned in favor of the plaintiff and against the defendants, which verdict was by the trial court approved and judgment in accordance therewith was duly entered, from which said judgment defendants bring error.

*C. G. Hornor,* for plaintiffs in error.

*John S. Burger* and *Moss, Turner & McInnis,* for defendant in error.

Opinion by ROBERTSON, C. (after stating the facts as above). There is but one question in this case that demands the consideration of the court. Was it an actionable tort for Schonwald and the Blackwell Ice Company to procure, induce, and cause, as charged in the petition, the persons who had contracts with Ragains for the purchase of his ice at retail to ignore and violate their contracts under the facts and circumstances of this case? The general verdict of the jury was a finding on all the facts as alleged in the petition necessary to sustain the judgment, so that the real inquiry may be narrowed down to the issue raised

by counsel for plaintiffs in error, viz., that the petition did not state facts sufficient to constitute a cause of action.

The question involved is of more than passing interest to the people of this state, the correct solution of which requires, not only careful consideration of the immediate questions primarily involved, but also the careful consideration of the so-called "business interests" of the state, as contradistinguished from the interests of all the people of the state, for all will, in a greater or lesser degree, be primarily affected. In order to better understand the real issue as submitted to the jury by the court, we will insert the two instructions which deal directly with the question under consideration. They are as follows:

"You are instructed that if you believe from a preponderance of the evidence that the plaintiff in this case, James G. Ragains, in the winter of 1905 made certain contracts and agreements with parties in the city of Blackwell, as alleged in his petition, to agree to purchase ice of and from said plaintiff and that the defendant, the Blackwell Ice Company, through its agent and representative, Dave Schonwald, or by Dave Schonwald alone, with the malicious, wrongful, and unlawful intention of injuring this plaintiff, and destroying his business, and depriving plaintiff of customers for the sale of the said ice, and for the purpose of procuring purchasers of plaintiff's ice with whom the plaintiff had contracts to disregard the same, and to refuse to carry out the contracts theretofore made with the said plaintiff, and that the said patrons did refuse, by reason of the wrongful acts of the defendants, their agents, or employees, to purchase ice of and from the plaintiff, then your verdict should be for the plaintiff and against the defendants, and each of them, for such sums as you believe will fairly and reasonably compensate him for damages sustained, not to exceed the amount prayed for in plaintiff's petition.

"You are instructed that the material and controlling questions for you to determine in this case are: First. Was there a contract by and between the plaintiff and certain customers, as alleged in plaintiff's petition, or any of them, whereby it was agreed by and between the plaintiff and his said customers that the said customers were to purchase of and from the plaintiff ice that he was to deliver upon his delivery of the same? Second. Were the customers of the plaintiff knowingly induced by the defendants, or either of them, or by their agents and em-

ployees, under their direction, to break said contracts with the plaintiff, intending thereby to injure said plaintiff and derive a benefit therefrom? Third. Did injuries result to the plaintiff?"

If these instructions fairly and correctly state the law applicable to the case at bar, then the judgment of the trial court is right, and must be affirmed; for, while there are other errors assigned, such as the admission and rejection of testimony, yet it is tacitly agreed by counsel that the question first above alluded to is the real and controlling question in the case.

In *Nashville, Chattanooga & St. Louis Ry. Co. v. McConnell* (C. C.) 82 Fed. 65, Judge Clark said:

"It needs no extended statement to make it manifest that the right to carry on a business without interference, without fraud, and without obstruction is one of the most valuable of all rights. Indeed, in the commercial world, the right of greatest value is the right to freely carry on a lawful business without unlawful interruption. It is a substantial right, which may be protected by any remedy known to the court as fully as a constitutional or statutory right, and as fully as a right in the ordinary forms of property."

Nims, on Unfair Business Competition, p. 347, in discussing this question, says:

"It has long been a recognized principle of common law that the prevention and curbing of competition is an unlawful act. The restriction of the freedom of trade is considered to be against public policy, and injurious to general welfare. During the past few years there has been a growing demand made on courts and Legislatures that they take measures to limit the freedom of competition of the so-called trusts, and also that they take other measures to give the small dealer larger protection and freedom in competition. *All these demands are made for the benefit of those who are not able to cope with the great powers of the commercial world that have come into existence under the law as it now exists.* These demands are socialistic in their nature. Freedom of competition, under modern conditions, seems to lead to a monoply—the very evil which the common law sought to avoid. This condition has been reached, in part, by the application of the very rules laid down by the common law to prevent monopoly. The discussion of these questions by the courts is to be found largely in cases dealing (a) with the right which it is claimed every man has to carry on his trade or calling

without molestation or interruption, cases dealing principally with rights of labor organization as to boycott, strikes; lockouts, etc.; (b) *with the right of persons under contract with each other as against one who intentionally causes a breach of that contract.* Cases of this sort are not usually classed as unfair competition cases, but the principles involved in them go straight to the question of fairness and honesty in business competition. If the limits to the right of one merchant to interfere with, to block, harass, and to injure, the trade of a competitor are not defined clearly, it means that the freedom of use of capital in commercial enterprises will be hampered and restricted unnecessarily. *If the business world is not certain of its rights as against those who intentionally and wrongfully procure the breaking of contracts for their own gain, public confidence in the binding force of contracts, which is now none too strong, will be weakened.''* (Italics ours.)

Legitimate competition, by fair means, is always lawful, and no cause of action accrues to one who is unable to compete with his stronger competitor, notwithstanding his entire business be swept away by the competitive strife. But unfair competition is, and always has been, frowned upon by the law, and the trend of the decisions from *Lumley v. Gye,* 2 El. & B. 216, to the present time seems to sustain the proposition that it is a violation of a legal right to interfere with contractual relations recognized by law, if there be no sufficient justification for the interference. Prof. Bruce Wyman, in his Control of the Market, tersely states the situation as it now exists, as follows:

"Generally speaking, a state of free competition has been for several centuries considered to be for the best interest of society; and therefore, in modern times, almost every business has been opened to almost every man, but at all times in economic history both restriction and freedom are to be found in the law; the proportion, however, changing greatly. In one epoch there is much legal limitation with little freedom left; in another age it is almost universal competition with some little regulation to be found. * * * But the modern conclusion, after some bitter experience, is, that freedom can be allowed only where conditions of virtual competition prevail, for, where there is monopoly without stern restriction, there is always great mischief. * * * Undoubtedly, therefore, the spirit of our present age demands that the great business enterprises shall be con-

ducted in accordance with the requirements of society. The present program of organized society is to see to it that those who have gained a substantial control of the market shall not be left free to exploit those who look to them to supply their needs. Men now see clearly that freedom of action may, even in the industrial world, work injuriously for the public, and it must then be restrained in the public interest. We have seen the results of unrestrained power, and we must not wish those who have control of our destinies be left to do with us as they please. * * * The attempt in every modern case of this sort is therefore to show something more than mere competition—to show in the particular case there are some special circumstances which bring the case outside the ordinary course of competition."

And, as illustrative of this idea, he cites us a striking instance, the case of *Passaic Print Works v. Ely & Walker Dry Gds. Co.,* 105 Fed. 163, 44 C. C. A. 426, 62 L. R. A. 673, wherein the defendant company was sought to be enjoined from selling certain brands of calico at a price less than that fixed by the manufacturer. The court, speaking through Mr. Justice Thayer, decided against the manufacturer, and among other things said:

"The owner of property, real or personal, has an undoubted right to sell it and offer it for sale at whatever price he deems proper, although the effect of such offer may be to depreciate the market value of the commodity which he thus offers, and incidentally to occasion loss to third parties who have the same kind or species of property for sale."

The point is made in that case that competition is an absolute justification, regardless of the circumstances. But this means fair competition. On the other hand, the case of *Tuttle v. Buck,* 107 Minn. 145, 119 N. W. 946, 22 L. R. A. (N. S.) 599, 131 Am. St. Rep. 446, 16 Ann. Cas. 807, held the other way, that being the case where a banker, a man of great wealth and influence in the community, maliciously established a barber shop and engaged a barber to carry on the business, and used his personal influence to attract customers from the plaintiff's shop, not for any legitimate purpose of his own, but to injure the plaintiff. Mr. Justice Elliott, speaking of the principle involved, said:

"It must be remembered that the common law is the result of growth, and that its development has been determined by the social needs of the community which it governs. It is the resultant of conflicting social forces, and those forces which are for the time dominant leave their impress upon the law. For generations there has been a practical agreement upon the proposition that competition in trade and business is desirable; and this idea has found expression in the decisions of the courts, as well as in statutes. But it has led to grievous and manifold wrongs to individuals, and many courts have manifested an earnest desire to protect the individuals from the evils which result from unrestrained business competition. The problem has been to so adjust matters as to preserve the principle of competition, and yet guard against its abuse to the unnecessary injury to the individual. To divert to one's self the customers of a business rival by the offer of goods at lower prices is in general a legitimate mode of serving one's own interest, and justifiable as fair competition. But when a man starts an opposition place of business, not for the sake of profit to himself, but regardless of loss to himself, and for the sole purpose of driving his competitor out of business, and with the intention of himself retiring upon the accomplishment of his malevolent purpose, he is guilty of wanton wrong and an actionable tort."

This case, while undoubtedly stating the law applicable to the peculiar facts there existing, goes farther than most of the courts in the enunciation of the principle which guarantees the rights of an individual to protection from an unfair competition. However, under our present economic and industrial conditions, there can be no doubt of the soundness of the doctrine therein announced.

In the case of *London Guaranty & Accident Co. v. Horn,* 206 Ill. 493, 69 N. E. 526, 99 Am. St. Rep. 185, Horn was a servant of Arnold & Co., and in the course of his employment by an accident he sustained a severe injury to his hand. His employers protected themselves from such accidents by a policy in the London Guaranty & Accident Company. Horn brought suit against Arnold & Co., and recovered $3,500 damages. Pending appeal the agent of the insurance company attempted to settle with Horn, and, failing, told him that he would procure his discharge from Arnold & Co., unless he settled. Horn still re-

fused to settle. Whereupon the agent of the insurance company did secure Horn's discharge by Arnold & Co. by the threat to cancel the entire policy in case they refused to discharge him. In an action by Horn against the insurance company for wrongfully interfering with his contract of employment with Arnold & Co., it was held that he could recover, and Mr. Justice Scott in delivering the opinion of the court said:

"It follows, therefore, that the act of the defendant, complained of, was wrongful and in the legal sense of the term, malicious, because without justification."

In *Moran v. Dunphy*, 177 Mass. 485, 59 N. E. 125, 52 L. R. A. 115, 83 Am. St. Rep. 289, it was said:

"We apprehend that there is no longer any difficulty in recognizing that a right to be protected from malicious interference may be incident to a right arising out of a contract, although a contract, so far as performance is concerned, imposes a duty only on the promisor. Again, in the case of a contract of employment, even when the employment is at will, the fact that the employer is free from liability for discharging the plaintiff does not carry immunity to the defendant, who has controlled the employer's action to the plaintiff's harm."

In *Quinn v. Letham*, App. Cas. (1901) p. 495, (which effectually answers and disposes of *Allen v. Flood*, 67 L. J. Q. B. 119, the strongest case supporting the contrary doctrine), it is said:

"It is a violation of legal right to interfere with contractual relations recognized by law, if there be no sufficient justification for the interference."

The earliest reported case dealing with this question, so far as we have been able to discover, is *Lumley v. Gye*, 2 El. & B. 216. In that case a Miss Wagoner had contracted with Lumley to sing at his theater. Gye induced her to break her contract and sing for him. The decision is to the effect that the inducement of Gye was a legal wrong. Mr. Justice Earl in his opinion said:

"He who maliciously procures a damage to another by violation of his right ought to be made to indemnify, and that whether he procures an actionable wrong or breach of a contract. He who procures the nondelivery of goods according to contract may inflict an injury the same as he who procures the abstrac-

tion of goods after delivery; and both ought, on the same ground, to be made responsible."

This case, notwithstanding the dissenting opinion of Lord Coleridge (upon which all cases holding that such interference is not actionable appear to be based), seems to state the law as followed by the courts of England even unto the present time, and is cited with approval and followed in all the reported cases that sustain the doctrine herein contended for. The case of *Glamorgan Coal Co. v. South Wales Miners' Federation,* 2 K. B. 545, decided in 1903, is one of the later English cases upholding this same view, and, in the course of the opinion in that case as written by Lord Justice Sterling, it is said:

"The justification set up seems to me to amount to no more than this—that the course which they took, although it might be to the detriment of the masters, was for the pecuniary interest of the men; and I think it wholly insufficient. The defendants took active steps to carry this policy into effect, and, as I have said, interfered to bring about the violation of legal rights."

A careful investigation of the cases shows that the rule announced in *Lumley v. Gye, supra,* which may be said to have established the English doctrine, has also been adopted and followed by a majority of the courts of the American states, and without doubt is the law of the land on the subject.

It is exceedingly difficult, however, to determine with accuracy what is fair competition and what is not, and what acts are malicious and unjustifiable. It seems to be impossible to formulate any general rule or definition that will answer for all cases, but each must depend, for its correct solution, upon its own peculiar facts and circumstances. Thus, in *Keeble v. Hickeringill,* 11 East, 574 (note):

"Plaintiff owned a decoy pond, and put upon it decoy ducks, nets, etc., for taking fowl. Defendant, knowing which, and intending to damnify the plaintiff in his vivary, and to fright and drive away wild fowl, used to resort thither, and, to deprive him of his profit, did  *  *  *  resort to the head of said pond and vivary and did discharge six guns laden with gunpowder and with the noise and stink of the gunpowder did drive away the fowls then being in the pond.  * . *  The defendant with

design to damnify the plaintiff  *  *  *  did place himself with a gun near the vivary and there did discharge the gun several times,  *  *  *  whereby the wild fowl were frighted away and did forsake the said pond."

Sir John Holt in the opinion in that case said:

"Making a decoy is lawful, using the ground for that purpose is profitable. If man hath a property, he may employ it for his pleasure and profit, as for alluring and procuring ducks to come to his pond. To learn the trade of seducing other ducks to come there in order to be taken is not prohibited by the law of the land or the moral law. When a man useth his art or his skill to take them, to sell and dispose of for profit, this is his trade and he that hinders another in his trade or livelihood is liable to an action for so hindering him.  *  *  *  Why otherwise are scandalous words spoken of a man in his profession actionable when without his profession they are not so? Though they do not affect any damage, yet they are mischievous in themselves, and therefore in their own nature productive of damage and therefore an action lies against him. Such are all words that are spoken of a man to disparage him in his trade that may bring damage to him. How much more when the defendant doth an actual and real damage to another when he is in the very act of receiving profit by his employment.  *  *  *  Where a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood, there an action lies in all cases."

This case is frequently cited as authority that a right of action existed at common law on account of injury to a man in his trade or calling. To our minds no possible doubt exists but that the common law has been, and is now, sufficiently comprehensive to furnish a full and complete remedy for the wrong complained of in the petition in the case at bar. So, also, is it our belief that the common law in these later days, with the ever-increasing demands made upon it for protection to the individual by reason of our material developments along industrial and economic lines, is sufficiently broad and comprehensive to relieve against such unfair and oppressive acts as those charged in the petition, and its applicability cannot be doubted. Wyman on Control of the Market, p. 8, says:

"No one can carefully study the authorities on the subject without feeling that we are just entering upon an important de-

velopment of the common law.   What branches of industry will
eventually be of such public importance as to be included in the
category of public concerns, and to what extent the control of
the courts will be carried in the effort to solve by law, the mod-
ern economic problems, it would be rash to predict.   Enormous
business combinations, virtual monopolization of the necessaries
of life, the strife of labor and capital, now the concern of the
economist and the statesman, may prove susceptible of legal con-
trol through the doctrine of this special law.   General doctrines
have been established; and upon their successful working out
depends to a large extent·the future economic organization of
the country.   Only if the courts can adequately control the estab-
lished monopolies in all contingencies may the business of these
concerns be left in private hands."

We need not, therefore, concern ourselves further as to
whether or not the relief afforded by the common law is ade-
quate, for without doubt it is amply sufficient, but let us con-
tinue our investigation to the ascertainment of whether or not
the facts of the instant case warrant the relief, which the law,
at all times, has stood and now stands ready to give.

In *Quinn v. Letham, supra,* Lord McNaghten said:

"An act which does not amount to a legal injury cannot be
actionable because it is done with a bad intent.   That is my
opinion in the sum and substance of *Allen v. Flood,* App. Cas.
1 (1898), and Lord Lindley in the same case said that *Allen v.
Flood, supra,* established the fact that Allen infringed no right
of the plaintiffs, although he acted maliciously."

The question was later considered by the House of Lords
in 1901, when it was held that a combination of two or more per-
sons, without excuse and without justification, to injure a man
in his trade by persuading or inducing his customers not to trade
with him, or his servants or customers to break his employ, is
actionable, provided he suffers damage.   Freedom for fair com-
petition is guaranteed to all, and, even though this competition
results in the ruin of the competitor's business and the loss of
all his property, there can be no right of action unless the suc-
cessful competitor has done some malicious, intentional wrong,
which is unjustifiable, and which is the cause of damage to the
injured or complaining party.   The American cases present a

seemingly hopeless conflict of opinion on the subject, yet, with
the above rule as a guide, it may safely be said that the doctrine
as announced in *Lumley v. Gye, supra,* is recognized and fol-
lowed by the majority of the American courts, and is amply
sustained, in our opinion, by the weight of authority, as it cer-
tainly is by the better reason as viewed in the light of our present
industrial and economic conditions. The leading American case
involving and sustaining this principle is *Angle v. Chicago, St.
Paul & Milwaukee Ry. Co.,* 151 U. S. 1, 14 Sup. Ct. 240, 38
L. Ed. 55. The opinion is by Mr. Justice Brewer, and among
other things he says:

"It has been repeatedly held that, if one maliciously inter-
feres in a contract between two parties and induces one of them
to break that contract to the injury of the other, the party in-
jured can maintain an action against the wrongdoer. *Green v.
Button,* 2 Cromp. M. & R. 707, in which the defendant, by
falsely pretending to one party to a contract that he had a lien
upon certain property prevented such party from delivering it
to the plaintiff, the other party to the contract, and was held re-
sponsible for the loss occasioned thereby. *Lumley v. Gye,* 2
El. & Bl. 216, in which a singer had entered into a contract to
sing only at the theater of the plaintiff, and the defendant ma-
liciously induced her to break that contract, and was held liable
to the damages sustained by the plaintiff in consequence thereof.
*Bowen v. Hall,* L. R. 6 Q. B. Div. 333, in which it was held that
an action lies against a third person who maliciously induces
another to break his contract of exclusive personal service with
an employer, which thereby would naturally cause, and did in
fact cause, an injury to such employer. In the opinion of Brett,
L. J., it was said: 'That wherever a man does an act which in
law and in fact is a wrongful act, and such an act as may, as a
natural and probable consequence of it, produce injury to an-
other, and which in the particular case does produce an injury,
an action on the case will lie. This is the proposition to be de-
duced from the case of *Ashby v. White,* 1 Ld. Raym. 938. If
these conditions are satisfied, the action does not the less lie
because the natural and probable consequences of the act com-
plained of is an act done by a third person, or because such act
so done by the third person is a breach of duty or contract by
him, or an act illegal in his part, or an act otherwise imposing
an actionable liability on him.' *Walker v. Cronin,* 107 Mass.

555, in which a manufacturer was held entitled to maintain an action against a third party who, with the unlawful purpose of preventing him from carrying on his business, willfully induced many of his employees to leave his employment, whereby the manufacturer lost their services and the profits and advantages which he would have derived therefrom. *Rice v. Manley,* 66 N. Y. 82, 23 Am. Rep. 30, in which a party had contracted to sell and deliver to plaintiffs a quantity of cheese, but, having been made to believe through the fraud of the defendant that the plaintiffs did not want the cheese, sold and delivered it to him, and it was held that an action could be maintained against the defendant for the damages sustained from failing to get the cheese. *Jones v. Stanley,* 76 N. C. 355, in which the court said: 'It was decided in *Haskins v. Royster,* 70 N. C. 601, 16 Am. Rep. 780, that, if a person maliciously entices laborers or croppers to break their contracts with their employer and desert his service, the employer may recover damages against such person. *The same reasons cover every case where one person maliciously persuades another to break any contract with a third person. It is not confined to contracts for service.'* Under these authorities, if the Omaha Company had *by its wrongful conduct simply induced the Portage Company to break its contract with Angle, it would have been liable to him for the damages sustained thereby."* (Italics ours.)

The essence of this decision is found in the syllabus, which reads:

"If one maliciously interferes in a contract between two parties and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer. Where one railroad company by its wrongful conduct induced another railroad company to break its contract with a contractor for its construction, it is liable to him for the damages sustained thereby; *a fortiori,* when it not only induces a breach of a contract by the latter company, but also disables it from performance."

In the case of *Walker v. Cronin,* 107 Mass. 555, quoted approvingly by the Supreme Court of the United States in *Angle v. Railway Co., supra,* it was held that:

"It is a familiar and well-established doctrine of the law upon the relation of master and servant that one who entices away a servant or induces him to leave his master may be held liable in damages therefor, provided there exists a valid contract

for continued service known to the defendant. It has sometimes been supposed that this doctrine sprang from the English statute of laborers, and was confined to menial service. *But we are satisfied that it is founded upon the legal right derived from the contract, and not merely upon the relation of master and servant,* and that it applies to all contracts of employment if not to contracts of every description." (Italics ours.)

In *Rice v. Manley,* 66 N. Y. 82, 23 Am. Rep. 30, the Supreme Court said in the syllabus:

"S. agreed to sell and deliver to plaintiff a quantity of cheese. Defendant by fraudulent and false representations induced S. to sell and deliver the cheese to him. The agreement between S. and plaintiff was not in writing, and was void under the statute of frauds, but it would have been performed by S. but for defendant's fraud. *Held,* that plaintiff could maintain an action against S. for the damages sustained."

In *Gore v. Condon,* 87 Md. 368, 39 Atl. 1042, 40 L. R. A. 382, 67 Am. St. Rep. 352, is found the following:

"The right to maintain the action can also be sustained upon the doctrine that a man who induces one of two parties to a contract to break it, intending thereby to injure the other or to obtain a benefit for himself, does the other an actionable wrong."

In *Lucke v. Clothing Assembly,* 77 Md. 396, 26 Atl. 505, 19 L. R. A. 408, 39 Am. St. Rep. 421, it is said in the syllabus:

"If a contract would have been performed but for the false and fraudulent representations of a third person, an action will lie against him although the contract could not have been enforced by action. Interference with the free exercise of another's trade or occupation or means of livelihood by fraud or force, such as preventing people, by threats or intimidation, from trading with or continuing him in their employment, is an actionable wrong."

In *Chipley v. Atkinson,* 23 Fla. 206, 1 South. 934, 11 Am. St. Rep. 331, Mr. Justice Haney says:

"An employee may maintain an action for damages against a third party maliciously procuring an employer to discharge him from employment under a legal contract for a certain period pending such period, provided damages result to the employee from his discharge; and under the same circumstances the action may be maintained, though the employment is not for a fixed

period, though no contract exists between the master and the servant and no legal right as between them is violated, still the servant may maintain an action for damages against the third person who has maliciously procured his discharge."

While in *Doremus v. Hennessey,* 176 Ill. 608, 52 N. E. 924, 54 N. E. 524, 43 L. R. A. 797, 802, 68 Am. St. Rep. 203, the Supreme Court of Illinois says:

"The common law seeks to protect every person against the wrongful acts of others, whether committed alone or by combination, and an action may be had for injuries done which caused another loss in the enjoyment of any right or privilege or property.  *  *  *  Losses willfully caused by another from motives of malice to one who seeks to exercise and enjoy the fruits and advantages of his own enterprise, industry, skill, and credit will sustain an action.  It is clear that it is unlawful and actionable for one man, for unlawful motives, to interfere with another's trade by fraud or misrepresentation, or by molesting his customers or those who would be customers, or by preventing others from working for him or causing them to leave his employ by fraud or misrepresentation or physical or moral intimidation or persuasion, with intent to inflict an injury which causes loss."

It must be observed that the case last cited holds that it is unlawful and actionable for a man for *unlawful motives* to interfere with another's trade, etc., by fraud or misrepresentation or physical or moral intimidation or persuasion, with intent to inflict an injury which causes loss.

That case does not hold it to be unlawful for one by fair and lawful argument and persuasion to interfere with the contractual relations of another, and without doubt a person has the legal right to persuade one to leave his employer's service, or to quit trading with another, provided, always, such persuasion and argument is fair and not unlawful, and is made and done with the honest intent and purpose of fairly bettering one's own business, trade, or employment, and not for the primary object of wrongfully destroying honest competition.  In the instant case, had the conduct of Schonwald and the ice company been directed and governed solely by the desire to legitimately eliminate Ragains' retail ice business by fair competition, no action could have been maintained against them, but it is plainly

evident that they were not so limited, directed, or actuated. The threats, coercions, and intimidating statements made by them to the customers of Ragains had for their sole and primary object, not the building up of their own legitimate business, but the destruction of Ragains' business, and that, too, by the most unreasonable, unfair, coercive, and unjustifiable methods. The only legitimate result of their conduct, as is plainly shown by the testimony, from the commencement of the troubles between them, was to injure unfairly, and without sufficient excuse or justification, the business of Ragains. They did not sell their ice cheaper. They did not claim to have a better grade or quality of ice. They did not offer better delivery facilities. They did not offer any inducement by way of credits, or time, in payment of accounts. They did not show by any legitimate or reasonable or justifiable method that the customers by patronizing them would obtain better results, or better service, than Ragains could furnish, and their sole and only excuse was that they enjoyed a monopoly of the ice business in Blackwell and vicinity, and thereby controlled the ice market, and that, unless the customers who had contracts with Ragains would forthwith break and violate those contracts, they could not have or purchase any ice from said defendants in case Ragains' ice supply, for any reason, should become exhausted; and they further informed said customers that Ragains could not, in the event of his supply becoming exhausted, purchase ice from any other person who supplied said city with ice on account of combinations and understandings had by said defendants with other ice companies, the benefits of which said combination were denied Ragains, and that, therefore, the said customers would be unable to procure any ice at all. There was no possible excuse or justification for such conduct. The actions of defendants without doubt were malicious and unwarranted.

By the term "malicious" we do not mean that defendants were actuated by motives of ill will against Ragains personally, but by it is meant an unreasonable and wrongful act done intentionally, without just cause or excuse. In 16 Am. & Eng. Enc.

Law (2d Ed.) 1112, the reason for stating these acts to be malicious is given as follows:

"The breach of contract gives a cause of action against a contracting party guilty of the breach, and is therefore a wrongful or unlawful act. The procurement of a breach of contract is wrongful, and, if the procurement is intentional and without excuse, it follows that it is malicious."

The reasons for this definition have been objected to as containing a step which assumes too much, in that the procurement of an act which gives a cause of action against the actor is universally wrongful. Subject to the limitations and restrictions hereinbefore alluded to, we are not willing to assent to this criticism. However, there is another definition of the term "malicious," in the adjudicated cases, which is not open to this objection, and it is sufficiently comprehensive to meet the requirements of the present case. Brett, L. J., in *Bowen v. Hall,* 6 Q. B. D. 338, defines a malicious act "as one done for the indirect purpose of injuring the plaintiff or benefiting the defendant at the expense of the plaintiff." In *Keeble v. Hickeringill, supra,* it was held that malice, or the intent to injure, will under certain circumstances cause an act, otherwise legal, to become illegal. Lord Watson, in *Allen v. Flood,* App. Cas. 92 (1898), said:

"The existence of a bad motive in the case of any act which is not in itself illegal will not convert that act into a civil wrong for which reparation is due. A wrongful act done knowingly and with a view of its injurious consequences may in the sense of law be malicious, but such malice derives its essential character from the circumstances that the act done constitutes a violation of law."

And in the same case, in discussing what would excuse a man from the charge of malice, he said:

"He shall act honestly * * * and shall not be prompted by a desire to injure the person who is affected by his act."

Bowen, L. J., in *Allen v. Flood, supra,* said:

"In order to justify the intentional doing of that which is calculated in the ordinary course of events to damage, and which does in fact damage another, in that other person's property or trade, you must have some just cause or excuse."

Which was afterwards characterized by Lord Chancellor Halsbury as "exactly accurate."

Justice Oliver Wendell Holmes said that:

"When a responsible defendant seeks to escape liability from an act which he had notice was likely to cause temporal damage to another, he must show justification."

In 19 Am. & Eng. Ency. Law (2d Ed.) p. 623, it is said:

" 'Malice' in its legal sense means a wrongful act done intentionally, without just cause or excuse."

Lord Campbell, in *Foreguson v. Kinnoul,* 9 Cl. & F. 321, said:

" 'Malice' in the legal acceptation of the word is not confined to personal spite against individuals, but consists in a conscious violation of law to the prejudice of another."

In *Page v. Cushing,* 38 Me. 523, "malice" is defined as:

"Acts willfully and designedly done which are unlawful are malicious in respect to those to whom they are injurious."

Bowen, L. J., in *Mogul Steamship Co. v. McGregor,* 23 Q. B. D. 612, said:

"Maliciously means and implies an intention to do an act which is wrongful, to the detriment of another."

Viewed in the light of the above definitions, we are willing to, and do, say that the acts of the defendants under the facts and circumstances of the case at bar were malicious and were without proper or sufficient justification or excuse. The learned trial judge happily stated the correct rule of law applicable to this case in his instructions to the jury. The jury resolved the question in favor of the plaintiff on conflicting testimony, which, however, was sufficient to sustain the verdict. The verdict being general, it is presumed that a finding was made on every question necessary to sustain the same. Should the conclusion as reached in this case be otherwise, under our present industrial and economic conditions, gross wrongs could, and doubtless would, be committed in the name of commercial freedom or legal competition. Great interests, financial, industrial, or other, could, by the strength of an unfair and wrongful combination, disguised as competition, arbitrarily and unjustly control the markets of the state as to all commodities. The result would be the elimi-

nation of fair and honest competition, without which there can be no freedom in the commercial world, or in other lines of human endeavor. It therefore becomes the duty of the courts to protect the weak from the intentional and unjustifiable wrongs of the powerful, and for that purpose the beneficent provisions of the ever growing and developing common law is amply able to correct the evils complained of. It is peculiarly the duty of the state to control by proper regulation all businesses which are of common and public interest. As was well said by Prof. Wyman in his Control of the Market:

"All businesses, both great and small, are subject, to be sure, to that general police power of the state, whereby in any civilized society an effort is made to so order things that one may not use his own so as to injure another. But the comparison of the large amount of regulation which is considered proper for the state to impose upon a monopolized business which the small amount of regulation which is considered proper for the state to enforce in regard to competitive business is in itself significant enough. The difference which is shown is more than one of degree. It becomes one in kind. In the ordinary business where regulation by competition is still sufficient the law cannot question the decision of the proprietor to refuse to sell to a particular applicant or to discriminate in his prices. But, where the business is in the hands of a monopolistic combination, refusal to sell may become a conspiracy and discrimination may be held illegal."

It therefore becomes the duty of the courts to guard with jealous care all the various interests of our commercial and industrial world, to the end that every man may, so far as possible, be guaranteed entire freedom of competition in every field of human activity, so far as the same may be consistent with the larger common interests of the whole.

Having reached this conclusion, it is unnecessary to consider the other assignment of error. The judgment of the district court of Kay county should be affirmed.

By the Court: It is so ordered.