[Civ. No. 27402.   Second Dist., Div. Four.   Jan. 8, 1964.]

DAVID ERLICH, Plaintiff and Respondent, v. CHAIM I. ETNER, Defendant and Appellant.

Richard A. Perkins for Defendant and Appellant.

Joseph W. Fairfield and Ethelyn F. Black for Plaintiff and Respondent.

KINGSLEY, J.—In 1960, plaintiff David Erlich, doing business as West Coast Poultry Company, was one of Los Angeles' largest distributors of kosher chickens. Sometime in January 1960 plaintiff agreed to supply the Beverly Hilton Hotel with 1,120 kosher chicken breasts for a Bonds for Israel Dinner which was to be held at the hotel in March. The chicken breasts were delivered on a Saturday—the Jewish sabbath. After the delivery, but just prior to the dinner, it was rumored that the chicken breasts represented to be kosher were in fact not kosher. This rumor prompted an immediate investigation by Rabbi Juda Glasner, the State Kosher Food Inspector. On the recommendation of Rabbi Glasner, plaintiff was charged in the Municipal Court of Beverly Hills with a violation of section 383b of the Penal Code (the Kosher Food Law).

Plaintiff's involvement in kosher law litigation received wide coverage in the local press and radio, and especially in the Anglo-Jewish press. The defendant, Rabbi Chaim Etner, purchased some 900 to 1,000 copies of the ''California Jewish Press'' edited and published by defendant Waxman, which carried a story pertaining to plaintiff's involvement in the kosher law litigation. Defendant then circulated these newspapers on the sabbath to Orthodox Jews as they were leaving their place of worship. Defendant next helped author a letter addressed to various kosher butchers doing business in Los Angeles, stating in substance that plaintiff was selling nonkosher chickens, chicken parts, chicken fat, and livers as kosher products. Defendant next authorized a letter which he sent to the State Kosher Food Inspector, asking him to investigate plaintiff's business because of alleged nonkosher activities.

Eventually plaintiff was acquitted of violating Penal Code section 383b. Defendant then proceeded to author a nine-page document entitled ''Special Edition of Kashruth Bulletin'' and sent copies to Orthodox Rabbis in Los Angeles, butchers, and others interested in Jewish communal affairs. This docu-

ment again complained of plaintiff's allegedly nonkosher activities.

It is apparent, from a careful reading of the reporter's transcript, that plaintiff's theory of the events involved was as follows: Defendant Etner was aggrieved at plaintiff because plaintiff no longer employed him as supervising rabbi in connection with plaintiff's kosher poultry business. Defendant Waxman, defendant Etner, and Rabbi Glasner were concerned because it appeared that the then legislative session might eliminate the appropriation for enforcement of the Kosher Food Law, of which Glasner was the state enforcement officer and of which Waxman considered himself to be the "father." Etner, Glasner and Waxman, together with the management of another kosher poultry dealer who was plaintiff's chief competitor, entered into a conspiracy to create an "incident" involving a violation of the Kosher Food Law, and to give that incident widespread publicity, with two ultimate objectives: (a) to induce the Legislature to continue the appropriation and (b) to drive Erlich out of the kosher poultry business to the enhancement of the business of his competitor. In furtherance of that conspiracy: one of plaintiff's employees was induced to deliver a large order of chicken breasts to the Beverly Hilton on a Saturday, in violation of the Jewish sabbath; Glasner purported to find, among the breasts so delivered, evidence that they had been purchased from a nonkosher supplier; Glasner instituted an unfounded criminal charge against plaintiff; and Waxman and Etner caused the publication of newspaper articles, and Etner distributed circular letters, among the Jewish community, recounting the alleged violation of the kosher laws.

Defendants' theory seems to have been as follows: In fact, plaintiff filled the Beverly Hills order, at least in part, by including nonkosher chicken breasts purchased from a nonkosher supplier. Etner, discovering this, as well as the sabbath delivery, in righteous wrath, sought to bring to book one whom he regarded as guilty of a serious breach of Jewish law. Waxman acted in complete innocence, and independently of anyone else, in publishing legitimate news articles about a judicial proceeding and in making fair editorial comment thereon. Glasner merely did his duty in investigating and instituting a prosecution for a violation of the law he was paid to enforce.

Originally two law suits were instituted by plaintiff

against defendant, and against others who are not involved in this appeal. Because of similarity of issues the two actions were consolidated. Although plaintiff's complaint alleged several causes of action, at the commencement of the trial a conference was had in chambers wherein it was stipulated that plaintiff would proceed against defendant Etner on the theory of trade libel only, and that he would file an amended complaint predicated on a single count of trade libel.

At the close of plaintiff's case in chief, a nonsuit was granted to defendant Waxman, on the ground that the evidence showed only the publication by him of qualifiedly privileged communications. The case went to the jury as to defendants Etner and the Haredim Board of Orthodox Jews.[1] The jury returned a verdict against both defendants for $75,000 compensatory damages and against Etner for $50,000 punitive damages. On a motion for new trial, the judge reduced the damages to $30,000 compensatory damages and $5,000 punitive damages. Plaintiff accepted the reduction and, after allowing a credit for a payment made by a codefendant, judgment was entered against defendant Etner for $28,000 plus costs. Etner appeals.

Although the testimony is far from being explicit, we conclude that it was sufficient to support the implied finding of the jury that Etner was guilty of some conspiracy[2] to create, or at least to play up and enhance, a kosher food law violation involving plaintiff, and that he was motivated by malice toward plaintiff in so acting; that he intended by his actions to cause the newspaper publicity which followed, not only in Waxman's paper but in the newspapers of general circulation in Los Angeles and Beverly Hills; and that, among his machinations, was causing plaintiff's employee, in plaintiff's absence, to make the sabbath delivery—which was the act which focused attention at the hotel and by Glasner, on plaintiff and his operations. Had plaintiff proceeded with a traditional action for defamation, the verdict, as reduced in

[1]The Haredim Board of Orthodox Jews was involved only by virtue of Etner's connection with it. It entered into a settlement with plaintiff and is not a party to this appeal.

[2]Since the case went to the jury against Etner and the Haredim Board only, it was not necessary for the jury to decide whether the conspiracy was as extensive as plaintiff's theory would suggest. Waxman was, of course, absolved by the trial court in granting a nonsuit; the evidence as to Rabbi Glasner's motivations and relationship to Etner is, at best, inconclusive and we do not intend to intimate any opinion, either way, as to him.

amount by the trial court, would have been proper. ■ It is settled law that, in some instances at least, disparagement of the goods of a businessman may be made in such a manner as to imply business dishonesty, giving rise to an action under sections 45 and 45a of the Civil Code in which, it being "libel per se," no special damages need be alleged or proven. (*Rosenberg* v. *J. C. Penney Co.* (1939) 30 Cal.App. 2d 609 [86 P.2d 696] ; Carpenter, *Libel Per Se in California and Some Other States* (1944) 17 So.Cal.L.Rev. 347.) And, had plaintiff elected to proceed by way of an action in tort for inducing a breach of contractual relations, relying not on the statements attributable to Etner but on the act of causing the sabbath delivery, the evidence, as we shall point out hereafter, would have supported a verdict in some amount.

■ However, as we have pointed out, plaintiff elected to proceed against Etner solely on the theory of trade libel. Appellant contends, correctly, as we conclude, that the rigorous requirements of proof of damage in such an action were not met in this case. ■ Trade libel is defined as an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff. (Rest., Torts, §§ 626 and 627.) ■ While, as we have pointed out above, general damages are presumed in a libel of a businessman, this is not so in action for trade libel. Dean Prosser has discussed the problems in such actions as follows: "Injurious falsehood, or disparagement, then, may consist of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general, ... The cause of action founded upon it resembles that for defamation, but differs from it materially in the greater burden of proof resting on the plaintiff, and the necessity for special damage in all cases. ... [T]he plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he has suffered special damages. ... Usually, ... the damages claimed have consisted of loss of prospective contracts with the plaintiff's customers. Here the remedy has been so hedged about with limitations that its usefulness to the plaintiff has been seriously impaired. It is nearly always held that it is not enough to show a general decline in his business resulting from the falsehood, even where no other cause for it is apparent, and that it is only the loss of specific sales that can be recovered. This means, in the usual case, that the

plaintiff must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived.'' (Prosser on Torts, 764-766.) (See, also, 63 Yale L. J. 65, 91; Handler, *Unfair Competition*, 21 Iowa L.Rev. 175, 196 et seq.)

Only one California case has been found which deals with the exact problem now before us. In *Wright* v. *Coules* (1906) 4 Cal.App. 343 [87 P. 809], plaintiff hotel owner claimed damages from loss of trade, due to newspaper articles published by the defendants. Two causes of action alleged the loss of specifically named prospective guests, a third attempted to allege a general loss. A demurrer was sustained, which the appellate court held was proper, since there was no allegation ''that he was damaged by the facts alleged ... in *a specific sum*, whatever that sum may be,'' but only an allegation of the gross receipts allegedly lost. The court, however, in holding that leave to amend should have been granted said at page 347: ''A general allegation ... of people being dissuaded *by reason of a publication* from making any contract with or coming to the hotel, or giving it their patronage, is sufficient.'' (Italics added.)

In *Burkett* v. *Griffith* (1891) 90 Cal. 532 [27 P. 527, 25 Am.St.Rep. 151, 13 L.R.A. 707], an action for ''slander of title,'' which is a form of action somewhat related to trade libel, the court said, at page 537: ''It is not actionable to speak disparagingly of the title of another, unless he is damaged thereby. The utterance of a mere falsehood, however malicious, will not sustain an action, unless damage has resulted therefrom (Addison on Torts, 25); and the damage which can be recovered is only such as is the direct and natural result of the utterance of the words. As in all other cases dependent upon special damage, there must be both injury and damage. The slanderous words, false in fact and maliciously uttered, constitute the injury and give the right of action; and the pecuniary damage sustained is the measure of recovery. If the words uttered are not false, or if there be no malice, there is no right of action, and *there can be no recovery, unless some special pecuniary damage has resulted from their utterance.''* (Italics added.)

▉ Measured by the rules above stated, it is clear that plaintiff failed in his proof.

(1) Although he testified as to his gross business, both in general and with certain customers, at times before and after the publications involved, he at no time offered any proof as

to the profit made at any of these times, nor whether his net profits had been greater or less after than before the publications. Consequently, there was no showing of *damage*, either in any specific sum or at all, just as in *Wright* v. *Coules, supra* (1906) 4 Cal.App. 343, there was no allegation of specific damage.

(2) Except as to the Beverly Hilton account, there was a total failure to show that any loss, even of gross business, was attributable to the publications for which Etner was responsible. True, plaintiff himself testified in broad terms that he had lost over-the-counter trade, naming some customers including the Ambassador Hotel and other accounts, because of the publicity given to his arrest and trial. But this was a mere conclusion on his part. He did not testify that any customer had ever assigned the publicity as a reason for ceasing to trade with him, nor, although the purchasing agents of his commercial accounts were available, were any called to give their own version of why they ceased dealing with plaintiff. While, under the *Wright* case, plaintiff may *allege* causation in general terms, he must still *prove* that fact by something more than his own guess as to what had gone on in his former customers' minds, where that mental operation was entirely uncommunicated to him or (so far as here appears) to anyone else.

(3) The nearest approximation of proof of causation is with relation to the Beverly Hilton account. Rabbi Schroit, the supervising rabbi at that hotel, testified that he no longer deals with plaintiff because of the sabbath delivery of the questioned chicken breasts. As we have indicated above, this testimony, if buttressed (as it was not) by proof of a loss in a specific sum, would have supported an action based on maliciously causing such delivery. But that cause of action was neither alleged nor relied on. Rabbi Schroit also testified that the hotel, because of the publicity, would not purchase from plaintiff even if the rabbi was willing to deal with him. But, as with plaintiff's own testimony, this is a mere conclusion on the rabbi's part, unsupported by any evidence of any statement by the purchasing agent, let alone any direct testimony from him.

Since no actual damages were proven, an award of punitive damages was, of course, improper. (*Haydel* v. *Morton* (1935) 8 Cal.App.2d 730 [48 P.2d 709].)

We have considered appellant's objections to certain rul-

ings on evidence and to claimed misconduct and find them to be without merit.

Since we conclude that plaintiff received a valid verdict insofar as it relates to all aspects of the case except damages, only that matter requires retrial.

The judgment is reversed, with directions to grant a new trial limited to the issue of damages only.

Burke, P. J., and Jefferson, J., concurred.

The petitions for a rehearing were denied January 27, 1964, and respondent's petition for a hearing by the Supreme Court was denied March 4, 1964.