**CRYSTAL GAS COMPANY, a corporation, Appellee,**

v.

**OKLAHOMA NATURAL GAS COMPANY, a corporation and Max L. Knotts, Appellants.**

**No. 45648.**

Supreme Court of Oklahoma.

March 12, 1974.

As Amended on Denial of Rehearing Dec. 10, 1974.

Fitzgerald, Houston & Worthington, by Donald L. Worthington, Stillwater, for appellee.

Huffman, Arrington, Scheurich & Kihle by John L. Arrington, Jr., C. Burnett Dunn, Tulsa, for appellants.

BERRY, Justice:

Crystal Gas Company [Crystal] brought this action against Oklahoma Natural Gas Company and officers and employees of the corporation alleging they interfered with Crystal's contractual and business relations. Crystal sought $500,000 actual damages and punitive damages. The trial court sustained a demurrer to Crystal's evidence as to all parties except O N G and Max L. Knotts, an officer of O N G [defendants]. The jury awarded $50,000 compensatory damages to Crystal and judgment was entered accordingly. Defendants appeal.

Crystal is a public utility which sells natural gas at retail. In January 1966, it commenced gas service to the town of Westport.

Westport is a housing development located in the peninsula area of Pawnee County, Oklahoma. The peninsula area is an area of several square miles bounded on three sides by Keystone Lake. In April 1966, Westport annexed several separate sections of land within the peninsula area and a 100 foot strip of land connecting the separate sections of land with the original town. The entire peninsula area was not annexed, but the annexed areas "fenced in" the entire peninsula area.

Westport's Board of Trustees passed an ordinance calling an election on whether to grant Crystal a 25 year franchise to use the streets, alleys and public grounds of the town for the purpose of supplying gas to inhabitants of the town.

Prior to the election Knotts and other officials of O N G attended a meeting held in Westport.

At the meeting they stated O N G did not intend to serve Westport. However, they stated O N G might not serve the unannexed portions of the peninsula area if Crystal were granted a franchise.

At the trial they explained why they made this statement. They testified they intended to serve the peninsula area by constructing a pipeline over the Highway 64 Bridge. The bridge crossed the 100 foot strip annexed by Westport. Furthermore, the end of the bridge on the peninsula side, and the road leading therefrom, were within an annexed area. They were of the opinion a franchise holder might be able to prevent them from crossing the annexed areas unless O N G also acquired a franchise. O N G did not desire to do this because it had no desire to serve Westport.

There was evidence that at the meeting Mr. Knotts gave the following opinion concerning Crystal's plastic lines:

"We do not believe plastic lines are safe. Plastic lines cannot carry more than 80 pounds of pressure. We do not believe that the present lines in Westport could adequately serve 500 homes but we couldn't be sure about that."

Subsequently the voters denied the franchise.

The parties agree that the loss of the franchise election does not prevent Crystal from continuing to serve the town of Westport.

Furthermore, the court in its instructions informed the jury that Crystal's failure to obtain a franchise was not an element of damages in this case.

However, Crystal asserts after the election it lost existing and potential customers and lost its financing.

On appeal defendants first contend the trial court erred in refusing to either sustain defendants' demurrer to Crystal's evidence or grant defendants' motion for a directed verdict. In this regard defendants argue Crystal did not present sufficient evidence to support a finding defendants'

statements were the proximate cause of harm to Crystal.

■ We have previously held that one has the right to carry on and prosecute a lawful business in which he is engaged without unlawful molestation or unjustified interference from any person, and any malicious interference with such business is an unlawful act and an actionable wrong. National Life & Accident Ins. Co. v. Wallace, 162 Okl. 174, 21 P.2d 492; Stebbins v. Edwards, 101 Okl. 188, 224 P. 714; Schonwald v. Ragains, 32 Okl. 223, 122 P. 203. However, we have held plaintiff must establish the defendant's wrongful acts were the proximate cause of plaintiff's injury. Owens v. Automotive Engineers, 208 Okl. 251, 255 P.2d 240; Emery v. A & B Commercial Finishing Company, Okl., 315 P.2d 950.

■ Arlie J. Nixon, Crystal's president, testified concerning damages suffered by Crystal as a result of defendants' statements and the loss of the franchise election. On direct examination he offered no testimony concerning loss of specific existing customers.

On cross-examination he testified after the election Crystal lost three customers other than those who had moved away. He did not state any of these customers had assigned defendants' statements or the loss of the franchise election as a reason for ceasing to purchase gas from Crystal. Furthermore, none of these customers were called to give their version of why they ceased purchasing gas from Crystal.

In Erlich v. Etner, 224 Cal.App.2d 69, 36 Cal.Rptr. 256, the court considered an action brought upon the theory of trade libel. However, the court indicated the following statement would also be applicable to actions for interference with contractual relationships:

"Except as to the Beverly Hilton account, there was a total failure to show that any loss, even of gross business, was attributable to the publications for which Etner was responsible. True,

plaintiff himself testified in broad terms that he had lost over-the-counter trade, naming some customers * * * because of the publicity given to his arrest and trial. But this was a mere conclusion on his part. He did not testify that any customer had ever assigned the publicity as a reason for ceasing to trade with him, nor, although the purchasing agents of his commercial accounts were available, were any called to give their own version of why they ceased dealing with plaintiff. While * * * plaintiff may *allege* causation in general terms, he must still *prove* that fact by something more than his own guess as to what had gone on in his former customers' minds, where that mental operation was entirely uncommunicated to him or [so far as here appears] to anyone else."

We conclude the evidence was insufficient to support a finding defendants' statements or the loss of the franchise election caused Crystal to lose existing customers.

Insofar as concerns loss of prospective customers, Crystal's theory is that it lost potential customers with whom it had agreements and it will not be able to serve future customers who move into the area.

On direct examination Mr. Nixon made no reference to specific potential customers who had refused to accept Crystal's service as a result of defendants' statements or the loss of the franchise election.

On cross-examination defendants' counsel referred to an interrogatory wherein Crystal had listed persons who refused to accept gas from Crystal and inquired as to whether three specific names were on that list. Mr. Nixon stated the names were on the list.

On redirect examination Mr. Nixon stated there were approximately 100 names on the list. He further stated he had applications from several people who cancelled their applications "because they said they were going to get gas from Oklahoma Natural."

Mr. Nixon did not testify any of these potential customers refused service from Crystal as a result of defendants' statements or the loss of the franchise election. Furthermore, Crystal did not call any of these potential customers to explain why they had refused to accept service from Crystal.

Defendants called three persons whose names were included upon the list and each testified he had never been offered gas service by Crystal and had never refused to accept gas from Crystal.

45 Am.Jur.2d, Interference, § 6, states:

" * * * Where there is no existing contract, as in the tort of interference with business relations, the plaintiff must show either that prospective economic advantage would have been achieved had it not been for such interference or that there was, in view of all the circumstances, a reasonable assurance thereof."

We conclude the evidence is insufficient to support an inference Crystal would have entered contracts to sell gas to these customers if defendants had not made the statements attributed to them.

Also, Crystal offered evidence concerning projected population growth in the peninsula area. This evidence indicated there would be more than 6000 new housing units in the peninsula area by 1982.

Mr. Nixon testified he expected 6000 new meters in the peninsula area by 1984. He testified he had been informed that as a rule of thumb one can expect a yearly net profit of $100 per meter.

Mr. Nixon's explanation concerning why Crystal would not be able to serve these potential residents of the peninsula area was rather vague. His apparent theory was that after the election he lost his financing and was unable to expand. Oklahoma Natural then piped the area. Thereafter it was useless for him to attempt to expand.

Mr. Nixon's testimony on direct examination concerning loss of financing was as follows:

"Q. Mr. Nixon, after the franchise election was defeated, did you have any difficulties getting financing?

"A. Yes, I lost my financing after that."

On cross-examination he testified as follows:

"Q. Mr. Nixon, you stated yesterday that the loss of the franchise caused you to lose your potential financing. Can you explain that?

"A. Yes sir. This lady—there was a lady and her husband—I say 'lady' because it was mostly her money, was putting up the money."

\*    \*    \*    \*    \*    \*

"Q. Mr. Nixon, you say you lost your financing. Will you describe the circumstances of losing Mrs. Hawkins' financing?

"A. Yes, sir. We were starting to bring material to put the rest of the peninsula gas in. We still have a considerable amount of four-inch pipe in the yard that we had bought that we were going to lay the rest of the line with. Mrs. Hawkins came out here to look into this situation and after the franchise election was denied, I mean, she became sure that Oklahoma Natural was going to come into the area and she said she wouldn't be interested in it anymore.

\*    \*    \*    \*    \*    \*

"Q. Now, with reference to Mrs. Hawkins, was it just the loss of the franchise that caused her to say that she wouldn't put up any more money?

"A. With the incursion of Oklahoma Natural in the area. It wasn't the franchise that caused her to do it, but this was the factor, that Oklahoma Natural came in as a result of it, or probably as a result of it was the reason that she withdrew.

"Q. The emergence of Oklahoma Natural as a competitor in the area?

"A. Yes, sir."

There was no testimony Mrs. Hawkins had heard of defendants' statements or that the statements could have influenced her decision concerning furnishing of financing.

Mr. Nixon's testimony implies it was O N G's emergence as a competitor in the area which caused Mrs. Hawkins to withdraw her financing.

■ In its instruction 10 the trial court instructed the jury that neither the town nor any franchise holder in the town could prevent O N G from traversing the annexed areas. On appeal Crystal argues that instruction was proper. Therefore, we conclude O N G is not liable for damages resulting to Crystal as a result of O N G's emergence as a competitor in the area.

Furthermore, Mrs. Hawkins was not called as a witness and no evidence, other than Mr. Nixon's testimony, was offered indicating whether she was ever willing to finance Crystal, whether she had the financial resources to finance Crystal, or why she decided not to finance Crystal.

■ We conclude this evidence is not sufficient to support an inference Mrs. Hawkins would have financed Crystal's expansion had it not been for defendants' statements and the loss of the franchise election. 45 Am.Jur.2d, Interference, § 6, supra.

■ Therefore, we hold the trial court erred in overruling defendants' motion for a directed verdict.

We grant certiorari and reverse the judgment of the Court of Appeals and the trial court and remand to trial court with directions to sustain defendants' motion for directed verdict, and enter judgment for defendants.

DAVISON, C. J., and IRWIN, LAVENDER and BARNES, JJ., concur.

WILLIAMS, V. C. J., and HODGES, SIMMS and DOOLIN, JJ., dissent.

WILLIAMS, Vice Chief Justice (dissenting).

I must respectfully dissent to the opinion promulgated by a majority of my associates in this case.

As I read the opinion, the verdict and judgment for plaintiff are reversed because (1) the evidence was insufficient to show that the statements admittedly made by officials of Oklahoma Natural Gas Co. were the proximate cause of plaintiff's damages; and (2) there was insufficient proof as to the amount of plaintiff's damages.

On the question of proximate cause, it is well settled that the trier of the fact may take notice of matters of common knowledge. Board of Education of Ind. Sch. Dist. No. 20 v. Adams, Okl., 465 P.2d 464. The highly explosive and flammable nature of natural gas, and the fact that this is a matter of common knowledge, cannot be denied. For this reason, in my view the members of the jury were justified in concluding that the statements of a high official of a well known public utility company, made at the public meeting, questioning the safety of plaintiff's transmission and distribution system, caused or contributed to the causing of the damages plaintiff suffered.

As to (2) above, relating to proof of damages consisting of the loss of business and future business, plaintiff introduced the testimony of an expert witness from a firm called Market Analysis Group who had made a survey and study of the area, and who testified as to the projected growth of the area for the next five years. From his testimony as to the number of residences to be expected in the area, plaintiff applied figures representing the estimated income per gas meter to arrive at a conclusion, in dollars, as to the amount of plaintiff's damages. In Bishop-Babcock-Becker Co. v. Estes Drug Co., 63 Okl. 117, 163 P. 276, a case involving damages for loss of anticipated profits, this Court said "It being apparent that some loss was suffered, it is then entirely proper to let the jury determine what the loss probably was from the best evidence the nature of the case [affords]". In my view the testimony of plaintiff's expert witness as to the loss of business and future business, taken in connection with the rule quoted in this paragraph, was a sufficient basis for the damages awarded by the jury in this case. As a matter of fact, the testimony mentioned would have supported a much larger award of damages than the one made in this case, and without regard either to loss of customers he formerly had or from plaintiff's alleged damages resulting from loss of financing.

For the above reasons, I respectfully dissent.

I am authorized to state that HODGES, SIMMS and DOOLIN, JJ., concur in the views herein expressed.