Pius AUGUSTINE and Dorothy Augustine, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

Nos. 85–1792, 85–2791.

United States Court of Appeals, Tenth Circuit.

Feb. 6, 1987.
Rehearing Denied March 26, 1987.

Doris Besikof, Denver, Colo., for plaintiffs-appellants Pius Augustine and Dorothy Augustine.

Nancy E. Rice, Asst. U.S. Atty., and Robert N. Miller, U.S. Atty., Denver, Colo., with her on the brief, for defendant-appellee U.S.

Before McKAY and TACHA, Circuit Judges, and WESLEY E. BROWN, Senior District Judge.*

WESLEY E. BROWN, Senior District Judge.

Appellants Pius Augustine and his wife, Dorothy, brought this action under the Federal Tort Claims Act for damages arising from alleged negligent medical treatment which Mr. Augustine received at the Medical Center operated by the Veterans Administration in Denver, Colorado. The action was based upon claims of alleged malpractice, lack of informed consent, and negligent misrepresentation by government employees at the Medical Center.

In September, 1981, plaintiff Pius Augustine underwent a non-surgical procedure in which an inflated balloon was used to dilate his esophagus in order to treat a swallowing problem which Veteran Administration doctors had diagnosed as achalasia, a muscle relaxation defect of the esophagus. One of the risks of such procedure is per-

foration of the esophagus, which requires major surgical repair. During the performance of the procedure in this instance, plaintiff's esophagus was punctured, and there was an approximate eight hour delay in diagnosing the problem and in performing the necessary surgery.

The case was tried to the court which found that the United States was negligent, in that medical personnel had been slow to discover the perforation and to effect the surgical repair. The evidence was clear, and the parties agreed, that there was no negligence connected with the original balloon dilation, or the subsequent surgical repair itself. R. Vol. 10, p. 336. On the basis of the finding of liability, the trial court entered judgment in favor of plaintiff for $8,000 as damages for pain and suffering only during the period of delay in discovering and repairing the perforation. No other damages were awarded since the court found that Dorothy Augustine had sustained no loss attributable to defendant's negligence. The Court also held that plaintiff had failed to prove lack of informed consent, or any negligent misrepresentation upon the part of defendant's medical personnel.

Plaintiff appeals the damage award as being insufficient, and contends that there was error of law in the findings concerning lack of informed consent, negligent misrepresentation, and Mrs. Augustine's claim for loss of consortium. Plaintiffs also request review of the trial court's ruling on pretrial motions relating to sanctions and the denial of the costs of depositions.[1]

After fully reviewing the record in this action, we are satisfied that the evidence fully supports the findings of the trial court on the liability issues as well as the finding upon damages. In brief, the evidence established that prior to the morning of September 2, 1980, plaintiff underwent tests at the Veterans Administration Hospital which resulted in the diagnosis of acha-

---

* Wesley E. Brown, United States District Senior Judge for the District of Kansas, sitting by designation.

1. The portion of the appeal relating to the trial court's September 16, 1985 ruling on costs appears as Case No. 85-2791 in this appellate court.

lasia, which involves a narrowing of the lower esophageal muscles to such an extent that food is unable to pass into the stomach. There are three or four methods of treatment for this condition, the two main ones being an attempt to dilate the stricture in a non-surgical manner by expanding a balloon which has been lowered into the esophagus, or by surgical repair of the condition through a procedure known as Heller's Myotomy.[2]

Treatment by balloon dilation is a medically recognized and reasonable means of treating achalasia. The major risk in such a procedure is perforation of the esophagus, with that risk rated generally from one to five percent. Another risk of this procedure is aspiration of stomach contents into the lungs. This rarely occurs.

Dr. Steven Ayres was the physician who performed the balloon dilation. He graduated from medical school in 1977, and then began advanced training at the University of Colorado Health Sciences Center which served four hospitals, including the Denver Veterans Administration facility. In September, 1980, he had completed a one-year internship, as well as an additional two years in internal medicine, and was "board qualified" in internal medicine, although he did not receive his certification until January, 1981. When plaintiff was referred to him at the VA hospital, Dr. Ayres was engaged in a two year fellowship in Gastroenterology, which he completed in 1983.

■ After diagnosing plaintiff's problem as achalasia, Dr. John Goff, Consultant in Gastroenterology and Dr. Ayres explained the options available for treatment, and plaintiff chose to undergo a balloon dilation. Although plaintiff testified that he did not understand the alternatives, and was not aware of the risks and possible consequences of the procedure, the trial court found, and the evidence supports the

finding, that plaintiff was told that the risk of pain was 100%; the risk of rupture was "1 in 100", and that the risk of aspiration was "rare". Dr. Ayres made a drawing of the procedure on the back of the consent form and the risks of the procedure were clearly noted on the face of the consent form which plaintiff signed. Plaintiff was told that in the event there was a rupture, an operation would be necessary to repair the damage.

The balloon dilation was performed at approximately 9:30 a.m. on September 2nd, and plaintiff returned to his room by 10:30 a.m. Dr. Ayres wrote orders that plaintiff's blood pressure and pulse were to be taken each thirty minutes, four times; then each hour for four times; then each four hours, for four times. Intravenous fluid was to be maintained, with nothing to be taken by mouth until supper time. Dr. Ayres also noted by way of "suggestion" that a chest x-ray should be taken only if vital signs changed, or chest pain increased.

Plaintiff's vital signs were taken at 10:30, 11, 11:30 and 12:00, and then hourly thereafter. At 12:30, plaintiff complained of chest pain, and Dr. Buckley, the medical intern on duty ordered a codeine injection which eased the pain.[3] Dr. Buckley was in and out of plaintiff's medical ward during the afternoon, and heard no further complaint concerning plaintiff's condition. A note on the chart reflected that plaintiff again complained of pain at 2:00 p.m.

At 5:30 in the evening Dr. Ayres came by and found plaintiff in pain. At that time his temperature was 99.9°. On checking the chart, Dr. Ayres noted that plaintiff's blood pressure had fallen to 84/60 at 3:00 that afternoon, but at 5:30, plaintiff's blood pressure and heart rate were normal. On physical examination he found no crepitus—a sensation found upon pressing the

---

2. The evidence was that treatment by medicine alone gave only temporary relief, and that attempts to gradually stretch the muscles by passing a flexible tube down into the esophagus gave only a brief and incomplete relief from the condition. Testimony of Dr. Mallory.

3. Dr. Buckley had previously performed a two hour physical examination of plaintiff, and had written up admission notes and medical orders on plaintiff's admission to the hospital on September 1st.

skin if air is present, and no chest sounds indicating pneumonia or aspiration. Dr. Ayres was puzzled and ordered a chest x-ray and white blood cell count. The x-ray disclosed an infiltration in the left lower lobe, not previously present in old x-rays, and an elevated white blood cell count. The x-ray did not show the presence of any mediastinal or subcutaneous air. At this time, Dr. Ayres assessed the situation as a possible aspiration pneumonia, with no evidence of esophageal perforation, although this possibility could not be ruled out. He then ordered a "barium swallow", which was performed about 9:00 p.m., after a radiologist had been called from home. At that time, plaintiff's temperature had risen to 100.3°. The barium swallow x-ray revealed an esophageal rupture, thoracic surgeons were called in, and surgery to repair the perforation began just before midnight on September 2nd.

The presence of a rupture in the esophagus is not immediately apparent following dilation procedures. Symptoms usually appear within 24 hours. Vital signs must be watched, pain, temperature and any elevated white cell count are symptoms. An x-ray may disclose the presence of air in the chest cavity, or there may be a fluid collection, perhaps at the base of the left lung. Sometimes air may be felt under the surface of the skin. In 1980 it was not standard medical procedure to order a barium swallow immediately after a balloon dilation in order to ascertain whether a perforation has occurred. When a perforation occurs, serious and life threatening damage to the patient ensues because salivary contents containing acid, enzymes and bacteria leak into the mediastinal lining of the chest, setting up an infection called mediastinitis. The damage and chest infection worsen with time, so rapid surgical repair is necessary within twenty-four hours of perforation. If surgery is performed within twenty-four hours, most patients survive. If the time is beyond that, there are usually many severe complications, and a large percentage of patients do not survive.

Dr. Nathan Pearlman began surgery on plaintiff around midnight, with the operation lasting four hours. There was much damage in plaintiff's chest due to infection, and tissues around the perforation would not hold stitches. For this reason a Celestin tube was inserted in order to divert salivary contents past the perforation, a gastrostomy tube was inserted to remove gastric juices from the stomach, a feeding tube was inserted downstream from the stomach, and two chest tubes were inserted to drain pus and air from plaintiff's chest cavity. Since the Celestin tube was sewn in, a later surgery was contemplated for its removal.

Following surgery, plaintiff remained in intensive care at the Veterans Administration Hospital until September 9, 1980, when he was transferred into regular ward facilities. In the opinion of Dr. Pearlman, plaintiff's post-operative recovery was "amazingly benign". At times, plaintiff appeared to be mentally confused, and he became frightened and dissatisfied with his treatment at the Veterans Hospital to such an extent that he and his family insisted that he be moved to Lutheran Hospital.[4] This was done on September 9th, against the advice of medical personnel at the Veterans Hospital.

At Lutheran Hospital plaintiff underwent two additional operations—one, a thoractomy on September 19, 1980, to drain pus from plaintiff's chest cavity, a not uncommon consequence of plaintiff's initial surgery—and the second, on October 24th, a laparotomy to remove the Celestin tube which had been inserted on September 2nd —also a normal and expected consequence

---

**4.** Plaintiff had been receiving disability payments from the Veterans Administration for service connected psychiatric problems arising from a brain concussion since 1960. In 1974 his disability was increased from 50% to 70%. There was evidence that plaintiff was confused and agitated when he arrived at Lutheran Hospital. The trial court noted that he "appeared to be confused and agitated here in court while testifying", but this was in no way related to his surgery.

of that surgery. He was discharged from Lutheran Hospital on November 1st.

In May, 1981, and in February, 1982, plaintiff had surgery to repair hernias in his incisions. Hernias are consequences of any type of operation. In 1984 he had further surgery to remove infected tissue from an incision made during hernia repair at Lutheran Hospital. This last surgery was apparently undertaken in conjunction with a second dilation procedure conducted by a Dr. Richmond at Lutheran Hospital. The problems associated with achalasia frequently reoccur, requiring additional dilation treatment.

Upon the basis of this evidence the trial court found that great care was taken to inform plaintiff of the risks associated with the balloon dilation, and the possibility of surgery if a rupture took place, and that there was no evidence of misrepresentation or conduct below the standard of care in reference to the issue of informed consent.

The court noted that there was no negligence in performing the balloon dilation itself, or in the subsequent surgical repair following surgery.

■ The court did find that there was a lapse in patient care because plaintiff should have been monitored more closely when he complained of pain at 2:00 p.m. when a doctor should have been called, and surgery could perhaps have been done by 4:00 instead of midnight. The consequence of this lapse in time however was not material because the surgery would have been the same, whether performed at 4:00 or midnight, because the damage from infection sets in within two hours of a perforation, and the post-operative progress would have been the same, even though the surgery had been performed at 4:00. For this reason, the damages awarded to plaintiff were limited to pain and suffering sustained during the delay in surgery.

■ With respect to her claim for damages, Mrs. Augustine testified concerning her personal care of plaintiff following his release from Lutheran Hospital. The trial court found that even if the surgery had been done earlier, plaintiff would have had a similar post-operative recovery, and therefore, she had sustained no damages because of the eight hour delay in surgery. In this appeal, Mrs. Augustine also complains that the trial court disregarded her loss of income from taking early retirement in order to care for her husband. As noted, plaintiff was released from the hospital on November 1, 1980. Mrs. Augustine did not retire until November 23, 1981, and she testified that plaintiff was able to care for himself by May of that year. The evidence established that the early retirement had nothing whatever to do with the delay of surgery at the Veterans Administration on September 2, 1980.

It clearly appears that all of the trial court's findings were supported by substantial evidence, and not clearly erroneous. Some of the findings were made after considering the credibility of the witnesses. This Circuit has often held that the determination of the weight and credibility of testimony is a matter exclusively within the province of the fact finder. *Velez v. Metropolitan Life Ins. Co.*, 723 F.2d 7, 10 (10 Cir.1983). Here, the trial court found defendant's expert, Dr. Mallory, to be a "very credible witness", and Dr. Pearlman, the surgeon, an "extremely credible witness". It was Dr. Pearlman's testimony that once two to four hours had passed after the perforation, the extent and nature of the repair surgery would have been the same.

Plaintiff contends that the trial court erred in refusing to reconsider the Magistrate's denial of Plaintiff's Motion for Costs and Sanctions. It appears that this motion was based upon a contention that the defendant had obstructed and impeded the preparation of the case for trial. The Magistrate denied the motion on February 29, 1984, after finding that no response was necessary and that a hearing would not be of assistance. On March 20, the Trial Court, after reviewing the motion, and the discovery order of the Magistrate, determined that the Order was not clearly erroneous or contrary to law under the provisions of 28 U.S.C. Sec. 636(b)(1)(A),

and therefore the Motion for Reconsideration would be denied.

 The refusal to impose sanctions is solely within the discretion of the trial court, to be reversed only when that discretion is abused. *Marshall v. Ford Motor Company*, 446 F.2d 712, 713 (10 Cir.1971). In this instance, plaintiff has failed to establish any abuse of discretion.

Plaintiff also claims that the trial court erred by refusing to tax as costs their counsel's travel expenses for one deposition, and the costs of other depositions which were not used at trial.

 Again, the question of appropriate taxation of costs is a matter solely within the discretion of the trial court, and again, plaintiff has failed to establish that the court abused that discretion. See *Cleverock Energy Corp. v. Trepel*, 609 F.2d 1358 (10 Cir.1979), *cert. den.* 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261.

We find no error and the judgment of the district court is AFFIRMED.