Michael F. MERRICK,
Plaintiff-Appellant/Cross-Appellee,

v.

NORTHERN NATURAL GAS COMPANY, a DIVISION OF ENRON CORPORATION, Defendant-Appellee,

and

Linda Roberts,
Defendant-Appellee/Cross-Appellant,

and

Enron Corporation,
Defendant-Appellant.

Nos. 89–5012, 89–5022 and 89–5064.

United States Court of Appeals,
Tenth Circuit.

Aug. 23, 1990.

428

Larry D. Henry, of Huffman, Arrington, Kihle, Gaberino & Dunn, Tulsa, Okl., for plaintiff-appellant/cross-appellee Michael F. Merrick.

Tom Q. Ferguson (Linda C. Martin, of Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Okl., with him on the briefs), of Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Okl., for defendant-appellee/cross-appellant.

Mary T. Matthies (E. Chris Kaitson, of Enron Corp., Houston, Tex., with her on the brief), of Matthies Law Firm, Tulsa, Okl., for defendant-appellant Enron Corp.

Before TACHA and McWILLIAMS, Circuit Judges, and CHRISTENSEN, District Judge.*

TACHA, Circuit Judge.

Michael F. Merrick filed this suit alleging that Northern Natural Gas Company (Northern Natural), a division of Enron Corporation (Enron), terminated Merrick's employment in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. sections 621–34. Merrick further contends that Enron breached an employment contract and that both Enron and his immediate supervisor, defendant Linda Roberts, intentionally inflicted emotional distress on Merrick. Roberts filed a counterclaim against Merrick, alleging intentional infliction of emotional distress.

Enron moved for summary judgment against all of Merrick's claims, Roberts moved for summary judgment against Merrick's claim of intentional infliction of emotional distress, and Merrick moved for summary judgment against Roberts' claim of intentional infliction of emotional distress. The district court granted all the motions. Both Merrick and Roberts appeal, each arguing that the district court erred by dismissing their respective claims on summary judgment. We affirm.

---

* Honorable A. Sherman Christensen, District Judge, United States District Court for the District of Utah, sitting by designation.

## I.

After serving as a major in the United States Army, Merrick joined Northern Natural as a security guard in 1973. Merrick was 36 years old at the time. From 1975 to 1984, Merrick held various staff administrative positions. In 1984, after completion of a management training program, Merrick became a gas contract representative at Northern Natural's Tulsa, Oklahoma office. He was responsible for negotiating a lower contract price for gas from gas producers with whom Northern Natural had contracted when the market price for gas was relatively high. In October 1985, Northern Natural transferred Merrick's immediate supervisor, Bobby Edwards, to a different office. Prior to Edwards' departure, Merrick spoke to him about his desire to be promoted to supervisor.

Following Edwards' departure, Northern Natural promoted Linda Roberts to the supervisory position. Numerous conflicts arose between Roberts and Merrick. Roberts alleged that Merrick took an unauthorized business trip, failed to inform her of an important meeting with a producer, and generally avoided speaking with her at the office by writing notes. Enron also states that several gas producers had complained about Merrick's conduct and treatment of them. Merrick denied these accusations. On February 26, 1986, with the approval of management, Roberts gave Merrick a probationary warning letter, which summarized Merrick's alleged internal communication problems and several instances of insubordination. Merrick refused to sign the letter, and Northern Natural terminated him the following day for alleged insubordination and poor communication skills. Merrick was 49 years old. Northern Natural replaced Merrick with a 27–year–old male.

## II.

In reviewing a grant of summary judgment, we utilize the same standard that the district court employs. We view the evidence and any possible inferences in the light most favorable to the party opposing summary judgment. *Gray v. Phillips Pe-* *troleum Co.,* 858 F.2d 610, 613 (10th Cir. 1988). If "there is no genuine issue of material fact," summary judgment is appropriate. Fed.R.Civ.P. 56(c). A genuine issue exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We review any legal questions de novo. *Wheeler v. Hurdman,* 825 F.2d 257, 260 (10th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987).

### A.

We turn first to the district court's grant of summary judgment on Merrick's claim of age discrimination. To establish a prima facie case of disparate treatment under the ADEA, the plaintiff must establish that: (1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged despite the adequacy of his work; and (4) his position was filled by a person younger than he. *EEOC v. Sperry Corp.,* 852 F.2d 503, 507 (10th Cir.1988). The employer then bears the burden of production to show a legitimate, non-discriminatory reason for the challenged action. *Id.* The plaintiff bears the burden of persuasion that the employer's proffered justification was pretextual and that the age of the employee was a determining factor in the employer's decision. *Id.* The plaintiff is not required to come forward with direct evidence of discriminatory intent. He is only required to show "that the employer's proffered justification is unworthy of credence." *Krause v. Dresser Industries, Inc.,* 910 F.2d 674, 677 (10th Cir.1990) (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). If the plaintiff establishes that the cited reasons for his termination were pretextual, the factfinder can infer that discrimination took place. *Cf. Furnco Constr. Corp. v. Walters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (a Title VII case) ("when all legitimate reasons for re-

jecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race") (emphasis in original).

It is uncontested that Merrick is within the protected age group, *see* 29 U.S.C. § 631, and that his replacement was in his late twenties. The parties dispute, however, whether Merrick was performing his work satisfactorily. On the one hand, the bulk of Merrick's last performance evaluation praises him. For instance, Merrick's immediate supervisor, Edwards, stated in part that: "Michael has consistently done a good job in negotiating agreements with his assigned producers.... During this review period Michael has accomplished all of his assignments in a fully competent manner." On the other hand, the report also contains a passage written by Merrick's department manager, Mr. Dempster, who cautioned that: "Michael needs to improve his interpersonal and communication skills. Even though he has performed his assigned responsibilities the past year, his 'militaristic' style of communication will continue to handicap future performance as well as limit future advancement opportunities."

We conclude that we need not resolve whether Merrick performed his work of negotiating gas contracts satisfactorily because, even assuming that Merrick has established a prima facie case, we agree with the district court that Merrick has failed to introduce a genuine issue of material fact suggesting that Enron's proffer of a nondiscriminatory reason for Merrick's termination was pretextual. Enron has come forward with evidence that Merrick was terminated because he was insubordinate to his immediate supervisor, Roberts, and had poor communication skills. Merrick has failed to introduce evidence giving rise to a genuine issue of material fact showing that Enron's reasons were pretextual. *See Ray v. Safeway Stores, Inc.,* 614 F.2d 729, 730–31 (10th Cir.1980) (holding that insub-ordination of employee was legitimate, nondiscriminatory rationale for termination).

Deposition testimony demonstrates that the management at Northern Natural was concerned with Merrick's combative personality. One of Roberts' interviewers, R. Casey Olson, told her that one of her two major objectives in her new job should be to "deal with the personnel problem that we have down there, primarily with Mr. Merrick." In his deposition, Olson stated that it was his impression that "Merrick was not doing well with his producer relations, that individuals were not satisfied with he being the Northern contact with them, and that they found it very difficult to work with him."

Shortly after Roberts assumed her new position, she held an individual meeting with each of the employees in her department. During her meeting with Merrick, she requested that he work on his intra-office communication and cultivate his relationships with the producers with whom he had to work by playing golf with them or by meeting with them outside of the office in some other social capacity. According to Roberts, Merrick responded by stating that "he didn't have time to play golf and spend that kind of time with producers; that he had been doing his job the way he was doing it quite satisfactorily to everybody else, and that he saw no reason to change that." In his own deposition, Merrick confirms that while he was "occasionally" willing to have lunch with producers, he was unwilling to spend the time necessary to play golf with them. At the conclusion of their meeting, Merrick asked Roberts to give him periodic updates on his performance rather than waiting until the next performance appraisal in June to tell Merrick how he was performing. Roberts states that, in return, Merrick promised to keep Roberts apprised of his activities by communicating with her regularly.

During the next eight weeks, Roberts met with Merrick several times to discuss his work performance. Roberts alleges that during this time Merrick continued to avoid her and not to communicate with her. Merrick disputes this allegation but admits

that to avoid conflicts, he "didn't look for opportunities to visit with her unnecessarily."

The tension between Roberts and Merrick erupted on February 4, 1986 when Roberts learned that Merrick had both taken a trip to Boston that she had disapproved and that he had failed to take reasonable steps to apprise her of an important meeting with a producer. Merrick informed Roberts about the meeting by placing a note on her desk although he knew that she was out of town and would probably not see the note until after the time scheduled for the meeting. According to Roberts, when she asked Merrick why he did not try to reach her out of town or leave a message with her secretary or the assistant supervisor, Merrick told her that it "wasn't his problem, that he had followed my instructions in communicating with me, and had done so by leaving a note." Roberts criticized Merrick's behavior and an argument ensued. Roberts states that Merrick told her that he did not have to listen to her complaints and got up to walk out. Roberts told Merrick that he did have to listen to her comments and then began swearing at Merrick. A shouting match followed. On February 26, Roberts and a representative from the personnel office gave Merrick a probationary warning letter. Merrick refused to sign the letter. He was terminated the next day.

In response to Enron's production of evidence showing that Merrick was terminated due to his insubordination and poor communication skills, Merrick contends that the proffered reasons for his termination were merely pretextual. In support of his position, Merrick offers a number of arguments, all of which can be grouped into three categories: (1) the decision to terminate Merrick was made prior to his arguments with Roberts; (2) comparable younger workers were treated better than older workers; and (3) Merrick had a good work record and his alleged insubordination and poor communication skills were insignificant. We address each argument in turn.

Merrick argues that deposition testimony from Fran Herndon, a secretary in the of-

fice, supports his contention that Roberts decided to terminate Merrick well before any of the cited problems arose. Merrick notes that soon after Roberts assumed her new position, Herndon heard Roberts say that the "personnel problem with Michael Merrick ... had to be addressed, and she was going to take care of it. And that she didn't think Bob Edwards could handle firing Mr. Merrick since he had hired him, but that she certainly could handle it." However, when asked to clarify her recollection of this statement later in the same deposition, Herndon stated: "I may have misquoted [Roberts]. She said that the job she took had two personnel problems that she considered a challenge, and knew she would be able to resolve." Herndon's testimony does not supply enough evidence for a reasonable jury to believe that Roberts had decided to terminate Merrick at an early date and that the cited reasons for Merrick's termination were merely pretextual.

In support of his argument that younger workers were treated more favorably than older workers, Merrick points to evidence that Herndon, the only other worker in the office over age forty at the time, was also placed on probation. However, Enron introduced evidence that Herndon was having problems on the job, and Merrick offered no evidence that these problems were pretextual. More importantly, Herndon was never terminated. Merrick also argues that he was not the only gas contract representative that received complaints from gas producers. However, while there is evidence that there were problems with other employees, Merrick does not present testimony that the magnitude of their problems rose to the level of his. For example, while Enron introduced evidence that Merrick told a gas producer during negotiations that producers were "greedy bastards," Merrick offers no evidence that any other representative told a gas producer anything of a comparable nature. *See McAlester v. United Airlines, Inc.*, 851 F.2d 1249, 1261 (10th Cir.1988) (Title VII case) (to establish that cited offenses were mere pretexts for termination, similar of-

fenses of other employees not terminated must be of equal seriousness).

Finally, Merrick contends that Roberts exaggerated Merrick's communication problems. Olson's testimony, however, provides ample support for Roberts' complaints about Merrick. While Merrick introduces evidence that Edwards and Dennis Brune, his former supervisors, generally praised his abilities, Merrick introduced no evidence that these supervisors thought he had good communication skills in the gas contracts representative position at issue here.

On the basis of the record before us, we hold that Merrick has not shown there is a genuine issue of material fact respecting whether the stated reasons for his termination were pretextual. Accordingly, there was no evidence from which a jury could infer age discrimination.

### B.

We next turn to Merrick's argument that Enron's termination of Merrick constituted a breach of contract. Merrick contends that Northern Natural violated three contracts that gave him various rights related to his termination. Merrick alleges that the first enforceable contract arose when Roberts told Merrick that she would keep him updated on his performance. Northern Natural allegedly established the second contract when it informed Merrick, through the probationary warning letter, that he was on probation for six months. The third contract allegedly arose when the president of Northern Natural replied to a letter of complaint from Merrick indicating that Merrick's grievance would be considered under the company's fair treatment policy. Merrick does not dispute that he was an at-will employee, but insists that the alleged contracts were consistent with his at-will status. We disagree.

In *Burk v. K–Mart Corp.*, 770 P.2d 24 (Okla.1989), the Oklahoma Supreme Court held that there is no implied covenant of good faith and fair dealing in an employment-at-will contract. *Id.* at 27. After the *Burk* decision, a terminated at-will employee cannot bring suit against a

former employer for an alleged bad faith termination. This is exactly what Merrick seeks to do. Merrick argues that Northern Natural breached three agreements to treat Merrick fairly and in good faith. As an at-will employee, however, Merrick had no contractual right to be terminated in good faith. Of course, Northern Natural was free to abolish Merrick's at-will status and enter into contracts guaranteeing Merrick some degree of good faith treatment, but Merrick concedes that he was an at-will employee. We hold that as an at-will employee, Merrick had no contractual rights to good faith treatment with respect to his termination.

### C.

We next turn to Merrick's claim and Roberts' counterclaim for intentional infliction of emotional distress. Both parties argue that the district court erred by dismissing their respective claims on summary judgment. We disagree.

In *Eddy v. Brown*, 715 P.2d 74 (Okla. 1986), the Oklahoma Supreme Court concluded that to establish intentional infliction of emotional distress, the plaintiff must demonstrate that he suffers from severe emotional distress resulting from the defendant's extreme or outrageous conduct. *Id.* at 76. "*Extraordinary* transgression of the bounds of civility is required." *Id.* at 77 n. 6 (emphasis in original). Liability cannot be premised on "'mere insults, indignities, threats, annoyances, petty oppressions or other trivialities.... plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind'.... it would be indeed unfortunate if the law were to close all the safety valves through which irascible tempers might legally blow off steam." *Id.* at 77 (quoting in part *Restatement of Torts (Second)* § 46, comment d (1977)).

■ Roberts contends that Merrick intentionally inflicted emotional distress through his insubordination, questioning of Roberts' authority, and hostile manner.

Merrick similarly argues that Roberts inflicted emotional distress on him by harshly criticizing him, yelling at him, cursing at him on one occasion, and by allowing another employee to switch offices with Merrick while Merrick was not in the office. We have no difficulty in concluding that the actions cited by the parties do not rise to the level of an "[e]xtraordinary transgression of the bounds of civility." *Eddy*, 715 P.2d at 77 n. 6. Insubordination, yelling, hostile reactions and the hurt feelings naturally accompanying such conduct do not give rise to a cause for intentional infliction of emotional distress. *See id.* at 77. We hold that Roberts and Merrick were involved in an ordinary employer-employee conflict and that the record is devoid of any evidence supporting either Merrick's or Roberts' claim of intentional infliction of emotional distress.

### D.

We turn next to Roberts' counterclaim for prima facie tort. Roberts seeks to recover damages from Merrick for prima facie tort on the grounds that Merrick allegedly harrassed and mistreated her because Roberts is a woman and because she does not conform her conduct to Merrick's religious beliefs. The district court granted summary judgment on this claim after adopting the magistrate's conclusion that Oklahoma has not recognized a cause of action for prima facie tort for private discrimination between co-workers. Roberts now argues that the district court erred by overlooking several cases that provide a basis for such a cause of action. We disagree.

 The prima facie tort doctrine permits the recovery of damages for conduct that does not fall within a traditional category of tort liability. The plaintiff need only establish that the defendant's "conduct is generally culpable and not justified under the circumstances." *Restatement of Torts (Second)* at § 870. This broad theory of tort liability has been adopted in only a handful of states, including Oklahoma. *See* Cressman, *The Prima Facie Tort Doctrine in Oklahoma: Common Law Protection of Business From Unjustified Interference*, 56 Okla.B.J. 1759, 1759 (1985). Although Roberts cites four cases in support of her claim that Oklahoma would permit a cause of action in prima facie tort for private discrimination between co-workers, we conclude that these cases are distinguishable because they are limited to malicious infliction of injury to business or property interests. *See Stebbins v. Edwards*, 101 Okl. 188, 224 P. 714, 715 (1924) (malicious interference with contractual relationships through fraudulent representations); *Magnum Elec. Co. v. Border*, 101 Okl. 64, 222 P. 1002, 1005 (1923) (malicious injury to another's business through the use of fraudulent representations); *Hibbard v. Halliday*, 58 Okl. 244, 158 P. 1158, 1159–60 (1916) (unjustified, malicious use of property with the purpose of inflicting damage on another's rental property); *Schonwald v. Ragains*, 32 Okl. 223, 122 P. 203, 210–11 (1912) (per curiam) (malicious interference with contractual relationships). Although *Hibbard* broadly stated that "[a]t common law there was a cause of action whenever one person did damage to another willfully and intentionally, without just cause or excuse," *Hibbard*, 158 P. at 1159, neither *Hibbard* nor any other Oklahoma Supreme Court case has extended this common law doctrine outside the context of malicious injury to business or property interests. We conclude that Oklahoma would not extend the cause of action for prima facie tort to private sex or religious discrimination between co-workers. We hold that the district court properly granted summary judgment on Roberts' claim in prima facie tort.

### III.

Finally, we address Enron's argument that the district court erred by denying attorneys' fees to Enron on the breach of contract claim and by refusing to assess Merrick with various costs sought by Enron. We address each issue in turn.

### A.

Enron argues that it is entitled to attorney's fees under Okla.Stat.Ann. tit. 12, sec-

tion 936 (1988), which provides: "In any civil action to recover on ... [a] contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services ... the prevailing party shall be allowed a reasonable attorney fee to be set by the court." Enron insists that this provision is applicable because it prevailed on Merrick's breach of contract claims. We disagree.

In *Russell v. Flanagan*, 544 P.2d 510 (Okla.1975), the Oklahoma Supreme Court construed section 936 and held that the phrase "relating to" modified "the purchase or sale of goods, wares, or merchandise" but did not modify "for labor or services." *Id.* at 512. As a result, to recover under section 936, a prevailing party on a labor or services contract claim must demonstrate that the claim is for labor or services rendered, not just that the claim relates to the performance of labor or services. "The question is whether the damages arose directly from the rendition of labor or services, such as a failure to pay for those services, or from an aspect collaterally relating to labor or services, such as loss of profits on a contract involving the rendition of labor and services." *Burrows Constr. Co. v. Independent School Dist.*, 704 P.2d 1136, 1138 (Okla. 1985). The statute applies if "recovery is sought for labor and services as in the case of a failure to pay for them.... Its provisions are inapposite if the suit be one for damages arising from the breach of an agreement that relates to labor and services." *Holbert v. Echeverria*, 744 P.2d 960, 966 (Okla.1987) (footnote omitted). Because Merrick sought damages for the alleged breach of a labor contract and not for the value of services rendered, we conclude that section 936 does not apply. We therefore hold that the district court properly rejected Enron's request for attorney's fees under section 926.[1]

## B.

Enron further asserts that the district court abused its discretion by refusing to assess various costs incurred by Enron in taking various depositions, making copies of the depositions, taking video depositions, serving depositions, and reimbursing witnesses for travel. We disagree.

Pursuant to 28 U.S.C. section 1920, the district court ordered Merrick to pay $2,886.45 to the prevailing party. Enron had requested $9,474.74 in costs. The district court explained that it reached its conclusion regarding the appropriate costs after considering the "cost for an original deposition of those depositions which were actually utilized by the court in considering defendant's motion for summary judgment. Defendant supplied the court with cumulative and irrelevant information not necessary to consider the merits of the case under controlling principles of law." The district court permitted Enron to recover the costs for the depositions of three people: Merrick, Olson, and Edwards.

Section 1920 provides: "A judge or clerk of any court of the United States may tax as costs the following: ... (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; ... (4) Fees for exemplification and copies of papers necessarily obtained for use in the case." We review a district court's assessment of costs for abuse of discretion. *Augustine v. United States*, 810 F.2d 991, 996 (10th Cir. 1987). We have previously noted that a district court rule that permits costs only for depositions received in evidence or used by the court in ruling upon a motion for summary judgment is narrower than section 1920. *Hernandez v. George*, 793 F.2d 264, 268–69 (10th Cir.1986). *See also Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1099 (5th Cir.1982) (stating that the best practice is to determine which depositions were reasonably necessary in the light of facts known to counsel at the time they were taken, rather than at trial), *modified on other grounds*, 701 F.2d 542 (5th Cir.1983) (en banc).

---

**1.** We accordingly reject Enron's suggestion that we should certify this question to the Oklahoma

Supreme Court.

In the context of this case, however, we are persuaded that the district court did not abuse its discretion. The district court assessed Merrick for the costs of deposing three key players in this case, whose depositions, the court stated, were the only ones actually utilized by the court in considering Enron's motion for summary judgment. We cannot conclude that the failure to assess the costs of deposing other parties was an abuse of discretion. *See Hernandez*, 793 F.2d at 269. We also conclude that the district court's failure to assess various other costs, including copying costs, did not constitute an abuse of discretion.

### IV.

The judgment of the district court is AFFIRMED.